MAXEY, Plaintiff-Appellant, v. REDEVELOPMENT AUTHORITY OF RACINE, WISCONSIN, and others, Defendants-Respondents. [Case No. 77–112.]

REDEVELOPMENT AUTHORITY OF CITY OF RACINE, Condemnor, v. FISH, and others, Condemnees-Respondents: MAXEY, and others, Condemnees-Appellants. [Case No. 78–689.]

Supreme Court

*Nos. 77–112, 78–689. Argued December 5, 1979.—Decided March 4, 1980.*

(Also reported in 288 N.W.2d 794.)

376

378

For the appellant there was a brief by *James C. McNeely* of Milwaukee, and a reply brief by *Ronald L. Wallenfang, John W. Daniels, Bruce R. Bauer* and *Quarles & Brady* and oral argument by *Ronald L. Wallenfang* and *Bruce R. Bauer*, all of Milwaukee. [Case No. 77–112.]

For the respondent, Redevelopment Authority of the City of Racine, there was a brief and oral argument by *Joseph E. Boyle*, city attorney, of Racine. [Case No. 77–112.]

For the respondents James R. Fish, et al., there was a brief by *Emery B. Benson* and *Benson, Butchart & Haley* of Racine, and oral argument by *Emery B. Benson*. [Case No. 77–112.]

For the appellants joint briefs were filed by *Ronald L. Wallenfang, John W. Daniels, Bruce R. Bauer* and *Quarles & Brady*, all of Milwaukee, for Louis T. Maxey; by *John W. Foley, Garth R. Seehawer* and *Foley, Foley & Seehawer, S.C.*, of Racine, for James R. Hammes; and by *Stanley F. Hack* of Milwaukee, for Continental Bank & Trust Company; with oral argument by *Mr. Wallenfang, Mr. Bauer, Mr. Hack* and *Mr. Foley*. [Case No. 78–689.]

For the respondent there was a brief and oral argument by *Joseph E. Boyle*, city attorney, of Racine. [Case No. 78–689.]

For the respondents, James R. Fish, et al., there was a brief by *Emery B. Benson, Benson, Butchart & Haley* of Racine, and oral argument by *Emery B. Benson*. [Case No. 78–689.]

HEFFERNAN, J. These appeals are from orders entered in separate actions in respect to condemnation proceedings concerning the same property and involving substantially identical parties. Case No. 77–112 is an appeal from an order of the Circuit Court for Racine County which dismissed the action for inverse condemnation commenced by Louis T. Maxey, the owner of a ninety-nine-year lease in the subject property. Case No. 78–689 is an appeal by Louis T. Maxey and the mortgagees of his leasehold interest from an order of the court in the subsequent direct condemnation action which excluded them from a share in the condemnation proceeds.

Louis T. Maxey is the lessee of a building located in Racine which the Redevelopment Authority of Racine sought to condemn as a part of an urban renewal project. Continental Bank & Trust Company and James R. Hammes are mortgagees of Maxey's interest as lessee.

On September 21, 1976, Maxey filed a petition for inverse condemnation pursuant to sec. 32.10, Stats. 1975.[1]

[1] "32.10 **Condemnation proceedings instituted by property owner.** Whenever any property has been occupied by a body possessing the power of condemnation but where such body has not exercised said power, the owner, to institute condemnation proceedings, shall present a verified petition to the circuit judge of the county wherein the land is situated asking that such proceedings be commenced. Such petition shall describe the land, state the board, commission or corporation against which the condemnation proceedings are instituted and the use to which it has been put or is designed to have been put by the board, commission or corporation against which the proceedings are instituted. A copy of said petition shall be served upon the board, commission or corporation which has occupied petitioner's land, or interest in land. The petition shall be filed in the office of the clerk of the circuit court and thereupon the matter shall be deemed an action at law and at issue, with petitioner as plaintiff and the board, commission or corporation as defendant. The court shall thereupon make a finding of whether the defendant is oc-

The circuit court with which Maxey filed his petition for inverse condemnation dismissed Maxey's action because the court concluded that the condemnor, Redevelopment Authority of Racine, and the City of Racine had exercised their power of condemnation. It is from this order of dismissal that Maxey appeals in Case No. 77–112.

On September 24, 1976, three days after Maxey filed his petition for inverse condemnation, the Redevelopment Authority filed its petition in the same court for direct condemnation of the same property pursuant to sec. 32.06 (7), Stats. 1975,[2] and on the same day, it filed a lis

cupying property of the plaintiff without having the right to do so. If the court determines that the defendant is occupying such property of the plaintiff without having the right to do so, it shall treat the matter in accordance with the provisions of this chapter assuming the plaintiff has received from the defendant a jurisdictional offer and has failed to accept the same and assuming the plaintiff is not questioning the right of the defendant to condemn the property so occupied. The court rendering a judgment for the plaintiff in an action brought under this section shall also award to the plaintiff as a part of such judgment such sum as will in the opinion of the court reimburse the plaintiff for reasonable costs, disbursements and expenses including reasonable attorney, appraisal and engineering fees actually incurred because of such action, but the judgment shall not, in addition thereto, award the owner taxable costs and disbursements pursuant to ch. 814."

[2] "32.06 **Condemnation procedure in other than highway, etc., matters.** The procedure in condemnation in all matters except streets, highways, storm or sanitary sewers, watercourses, alleys and airport acquisitions, acquisitions under chapter 275, laws of 1931, as amended (Kline Law), acquisitions under ch. 157, and acquisitions under ch. 197, shall be as follows:

". . . .

"(7) PETITION FOR CONDEMNATION PROCEEDINGS. If the jurisdictional offer is not accepted within the periods limited in sub. (6) or the owner fails to consummate an acceptance as provided in sub. (6), the condemnor may present a verified petition to the judge of the circuit or county court of the county in which the property to be taken is located, for proceedings to determine the

pendens. After dismissal of Maxey's action for inverse condemnation, the condemnor's direct action was transferred to the Racine County Condemnation Commission for processing in accordance with the procedures set forth in sec. 32.06(7). Following those procedures, the Condemnation Commission made a total compensation award of $350,000 to the persons having an interest in

necessity of taking, where such determination is required, and the amount of just compensation. Such petition shall state that the jurisdictional offer required by sub. (3) has been made and rejected; that it is the intention of the condemnor in good faith to use the property or right therein for the specified purpose. It shall name the parties having an interest of record in such property as near as may be and shall name such parties who are minors or persons of unsound mind or unknown. Such petition may not disclose the amount of the jurisdictional offer, and if it does so it shall be a nullity. Such petition shall be filed with the clerk of such court. Notice of such petition shall be given as provided in s. 32.05(4) to all persons having an interest of record in such property, including the special guardian appointed for minors or incompetent persons. A lis pendens shall be filed on the date of filing the petition. The date of filing the lis pendens shall be the 'date of evaluation' of the property for the purpose of fixing just compensation, except that if the property is to be used in connection with the construction of a facility, as defined under s. 196.491 (1), the 'date of evaluation' shall be the date that the first advance plan identifying such property as a site or route under s. 196.491(2)(a)3 is filed with the public service commission, or the date which is 2 years prior to the date the certificate of public convenience and necessity is issued for the facility, whichever is earlier. The hearing on the petition may not be earlier than 20 days after the date of its filing unless the petitioner has acquired possession of such land pursuant to s. 32.12(1) in which event this hearing is not necessary. If the petitioner is entitled to condemn the property or any portion thereof the judge shall forthwith assign the matter to the chairman of the county condemnation commissioners for hearing pursuant to s. 32.08. An order by the judge determining that the petitioner does not have the right to condemn or refusing to assign the matter to the chairman of the county condemnation commissioners may be appealed directly to the supreme court."

the property. Insofar as the record reveals, this included Maxey, the two mortgagees of his leasehold interest, and the seven lessors who were owners of the fee. Of the $350,000 awarded, $40,087 was used to pay delinquent taxes on the property. The balance was deposited with the Clerk of Circuit Courts to await final disposition of the action.

The exact nature of the Condemnation Commission's award does not appear in the record. On appeal to the Circuit Court, however, the sole issue was the allocation of the condemnation award. The Circuit Court found that, because of provisions in the lease between Maxey and the lessors, Maxey's interest in the lease terminated upon the taking of the property; and, accordingly, neither he nor his mortgagees were entitled to share in the proceeds. Additionally, the Circuit Court concluded that, because Maxey had defaulted in his lease agreement by the nonpayment of rent and the nonpayment of taxes prior to the taking, his leasehold interest had automatically terminated prior thereto and, for that additional reason, he had no interest in the leasehold premises. The Circuit Court held that Maxey and his mortgagees were excluded from receiving any portion of the condemnation proceeds. An appeal was taken by Maxey and his mortgagees from the Circuit Court order to the Court of Appeals.

The order dismissing Maxey's inverse condemnation case was dated November 9, 1976. At that time, the only court to which an appeal could be taken was the Supreme Court of Wisconsin. The inverse condemnation appeal was entered on the Supreme Court's docket as Case No. 77–112. The Circuit Court's order of October 12, 1978, in respect to the direct condemnation was appealed to the newly created Court of Appeals, which commenced exercising its jurisdiction on August 1, 1978.

Because this court was aware of the related case pending in the Court of Appeals, pursuant to sec. 809.61, Stats., we directed a bypass of the Court of Appeals and ordered that Maxey's appeal filed there be heard in conjunction with the appeal pending in the Supreme Court.

It is apparent from the recitation of these procedural facts that, if the Circuit Court erred in dismissing the inverse condemnation, there was no jurisdiction in the Condemnation Commission or in the Circuit Court to hear the Redevelopment Authority's direct condemnation action. We conclude that the Circuit Court erred in dismissing the inverse condemnation action. We reverse that order and direct that the cause be remanded for further inverse condemnation proceedings, as provided by law.

Because we conclude that the direct condemnation action was erroneously carried forward, we order that the action be dismissed.

We first determine whether the court erred in dismissing Maxey's action for inverse condemnation. The record shows that Maxey was the owner of a ninety-nine-year lease on real property known as the Baker Block Building. Maxey is the successor in interest to the original lessees, and his leasehold interest is subject to mortgages held by Continental Bank & Trust Company and James R. Hammes. Approximately forty years were yet to run on Maxey's leasehold interest.

The Redevelopment Authority of Racine, the condemnor, was created by the Racine Common Council on March 6, 1974, pursuant to sec. 66.431, Stats. The Redevelopment Authority formulated a plan known as Redevelopment Plan for the Monument Square East Urban Renewal Area. The plan was approved by the Racine Common Council's resolution on April 7, 1976. The Baker Block Building, the property involved in these condemna-

tion proceedings, was within the boundaries of the redevelopment plan. During 1975, the Authority made an appraisal of the Baker Block Building and commenced negotiations with Maxey and with the fee simple owner-lessors. The lessors accepted the jurisdictional offer, but Maxey and the two mortgagees of his leasehold interest rejected it.

It was stipulated by the parties that, while the redevelopment plan was being formulated, the Common Council of Racine, on June 5, 1973, by resolution placed a moratorium on the issuance of theater licenses in the central business section of Racine. The area covered by the moratorium included the Baker Block Building, which housed a theater then licensed by the city. On August 20, 1974, pursuant to the previously passed moratorium, the Racine Common Council by resolution refused the application of the theater operator for a renewal license for the theater.

The Redevelopment Authority and the City, after June of 1973, by their agents made statements which were published in the press to the effect that the Baker Block Building "would be taken" through eminent domain proceedings. In addition, the City and the Redevelopment Authority contacted tenants in the Baker Block Building and told them that the property would be condemned and "encouraged and/or caused tenants to vacate the premises." In December of 1975, the City of Racine had the Baker Block Building property removed from the City's tax rolls.

On July 15, 1976, the Redevelopment Authority made a jurisdictional offer for the purchase of Maxey's interest. This offer was declined. On September 21, 1976, Maxey filed the petition for inverse condemnation pursuant to sec. 32.10, Stats. Three days later, while the inverse condemnation action was pending, the Redevel-

opment Authority, in accordance with sec. 32.06, filed its petition for direct condemnation and filed a lis pendens.

In Maxey's action for inverse condemnation, the Circuit Court, following the directions of sec. 32.10, found that Maxey was the owner of the property for the purpose of condemnation proceedings and that, in the posture of the case, the City of Racine and the Redevelopment Authority were responsible for each other's acts in regard to the acquisition and purported condemnation of the Baker Block Building. The court also found that the property had been taken by the condemning authority when, by governmental action of the City of Racine as a part of the Urban Renewal Project, it refused to issue a theater license for the Baker Block Building upon the application made by the tenant. It found that the taking had occurred on that date, August 20, 1974.

It ruled as a matter of law, however, that the inverse condemnation could not go forward because the condemnor had exercised its powers of condemnation or had begun exercising its condemnation powers when it made its jursidictional offer on July 15, 1976. Sec. 32.10, Stats., provides:

"Whenever any property has been occupied by a body possessing the power of condemnation but where such body has not exercised said power, the owner, to institute condemnation proceedings, shall present a verified petition . . . ."

Accordingly, the Circuit Court dismissed Maxey's petition.

The order dismissing the inverse condemnation action was appealable because, under sec. 817.33, Stats. 1975, the statute then in effect in respect to appealability, the order was made by the court which affected "a substantial right, made in any action, when such order in effect determines the action and prevents a judgment from which an appeal might be taken."

There is no doubt that the inverse condemnation proceeding, which is deemed an action at law by sec. 32.10, Stats., affords a property owner a substantial right. This right was terminated by the order, and the order had the effect of concluding the action and prevented a judgment from which an appeal could be taken.

Additionally, the trial court's order was essentially a determination of jurisdiction. The court found that it had no jurisdiction to allow the inverse condemnation to be pursued where the condemnor's direct action powers had already been exercised. The order was therefore also appealable under sec. 817.33(3)(f), Stats. 1975, as being one which "decides a question of jurisdiction."

Under sec. 32.10, Stats., a trial court may not dismiss an inverse condemnation without making a determination whether the petitioner's property interest is sufficient to make him an owner, whether the property has been occupied or taken, and whether the condemnor has failed to exercise its condemnation powers. We agree with the trial court's conclusion that Maxey was an owner within the meaning of the statute and that the property was taken when the City Council refused to renew the theater license, but we disagree with the conclusion that the condemnor had exercised its powers prior to the filing of Maxey's petition for inverse condemnation.

The trial court held that Maxey, who was the assignee of a ninety-nine-year lease, was the owner for the purpose of bringing an inverse condemnation action. This determination is correct as a matter of law. 2 Nichols, *Eminent Domain* (3rd ed.), sec. 5.23, p. 5–83, and cases cited therein. The Attorney General of Wisconsin, summarizing Wisconsin law relating to whether a lessee under a long-term lease is an owner for the purpose of receiving a condemnation award, stated:

"Under Wisconsin law, a lessee with a lease for more than one year is a joint owner with the lessor of real property. Consequently, such a lessee would qualify for payment pursuant to sec. 32.19(4)(a)5., Stats. . . ." 61 Op. Atty. Gen. 16, at 18 (1972).

The opinion of the Attorney General was based upon sec. 235.50, Stats. 1969, and established Wisconsin case law holding that long-term leasehold interests constitute ownership of land. *See, Catholic Knights of Wisconsin v. Levy*, 261 Wis. 284, 53 N.W.2d 1 (1952), and *Peterson v. Johnson*, 132 Wis. 280, 111 N.W. 659 (1907).

The trial court correctly held that Maxey qualified as an owner of property as that term is used in sec. 32.10, Stats. It is also a jurisdictional prerequisite to the bringing of an inverse condemnation that the property prior to the commencement of the action "has been occupied by a body possessing the power of condemnation."

As the stipulated facts demonstrate, there was some impingement upon Maxey's uninhibited use of the property almost from the time the redevelopment project was proposed in 1973. In order to commence inverse condemnation proceedings, however, a property owner must demonstrate that there has been either an occupation of his property within the meaning of sec. 32.10, Stats., or a taking, which must be compensated under art. I, sec. 13, of the Wisconsin Constitution. *Howell Plaza, Inc. v. State Highway Comm.*, 66 Wis.2d 720, 226 N.W.2d 185 (1975) (*Howell Plaza I*).

Prior to *Howell Plaza I*, this court relied upon *Muscoda Bridge Co. v. Worden-Allen Co.*, 196 Wis. 76, 219 N.W. 428 (1928), which held:

"It is only where those authorized to exercise the power of eminent domain are actually in the possession of and enjoying the use of property that the owner thereof is remitted to the proceedings under ch. 32." (at 88)

In *Howell Plaza I*, we modified this rule, stating:

"We conclude that there need not be an actual taking in the sense that there be a physical occupation or possession by the condemning authority . . . . We hold that, to state a cause of action in the absence of actual possession or occupation, an allegation for inverse condemnation under sec. 32.10, Stats., will be sufficient only if the facts alleged show that the property owner has been deprived of all, or practically all, of the beneficial use of his property or of any part thereof." (at 730)

The case of *Howell Plaza, Inc. v. State Highway Comm.*, 92 Wis.2d 74, 284 N.W.2d 887 (1979) (*Howell Plaza II*), further expanded upon the analysis of *Howell Plaza I*. *Howell Plaza II* explains the significance which the trial judge herein placed upon the Racine Common Council's denial of a theater license on August 20, 1974. In *Howell Plaza II*, the petitioner argued that a taking occurred because the condemnor, Highway Commission, urged the local municipality to refuse building permits for property located within the corridor of the proposed highway project. The petitioner was informed by the city planner that any application for a building permit would be denied. This court on appeal, in holding that a taking did not thereby occur, emphasized that the condemnor lacked the legal authority to restrain development and that the petitioner's decision not to develop its property was completely voluntary. This court in *Howell Plaza II* reasoned:

"If the commission had placed a legal restriction upon petitioner such that it was permanently prevented from improving its property in any way, a taking would probably have occurred. 'Where [a] restriction is so great [that] the landowner ought not to bear such a burden for the public good, the restriction has been held to be a constructive taking even though the actual use or forbidden use has not been transferred to the government so as to be a taking in the traditional sense.' *Just v. Marinette County*, 56 Wis.2d 7, 15, 201 N.W.2d 761 (1972).

Thus, a taking occurs where 'the restriction practically or substantially renders the land useless for all reasonable purposes.' " (at 84–5)

The court reiterated the same point later in the opinion:

"In none of those 'recent cases' [discussed in *Howell Plaza I*] had the court held that, where loss of all, or substantially all, beneficial use is caused indirectly by governmental action, a taking occurs. All of them had involved restrictions upon the use of the property. *See Just v. Marinette County*, 56 Wis.2d 7, 201 N.W.2d 761 (1972). We did not intend in *Howell Plaza I* to expand the definition of 'taking' beyond our holding in *Just*. A taking can occur absent physical invasion only where there is a legally imposed restriction upon the property's use.

"The requirement that there be a legal restraint by the condemning authority in order for a taking to occur absent physical invasion appears to be the prevailing rule in other jurisdictions." (at 88)

In the instant case the trial court found that the City of Racine and the Redevelopment Authority were to be considered as alter egos in respect to the condemnation of the Baker Block Building. This ruling is not questioned on this appeal. It is therefore apparent that the City's refusal to relicense the theater because of the projected urban renewal project constituted a legal restraint by the condemning authority on Maxey's use of the property. Under the rationale of *Howell Plaza I* and *Howell Plaza II*, there was a taking on August 20, 1974.

A perusal of the record demonstrates that the denial of the theater license reprived Maxey of a substantial portion of the beneficial use of his leasehold interest. Because the record does not demonstrate the exact proportion of the rental that was derived by Maxey from the entire property, it is difficult to quantify the loss of

beneficial interest. However, it is not disputed that it was a condition of the original lease that a theater was to be constructed on the property in the early 1920's at a cost of not less than $50,000. This new construction was considered so integral a part of the leasehold that, because of the original lessee's compliance with the theater construction provisions, the lessee was to be afforded a year's redemptive privilege in the event of default when apparently no period of redemption was allowed theretofore. From the record, it is therefore apparent that the beneficial interest of the lessee in the theater portion of the property was indeed substantial.

The situation in the instant case is unlike that posed in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978), rehearing denied 439 U.S. 883. In that case it was alleged that the operation of New York law constituted a taking, because the property owner was prevented by the law from constructing a 50-story office building over the Grand Central Railroad terminal. The United States Supreme Court held that a taking had not occurred, because Penn Central could continue to use the terminal for its intended purposes in an economically gainful fashion.

Applying the standards of *Penn Central* to the instant case, it is apparent that a theater which could not be licensed would not be of economic value for its intended purpose. Under the standards used by the United States Supreme Court, we conclude that the refusal to grant a theater license eliminated the economic value of the theater and, under Wisconsin law, constituted a taking—the petitioner was substantially deprived of his economic interest in the property.

While we conclude that the failure to renew the theater license in itself supports the finding of a taking, the City additionally stipulated that, on or before that date, August 20, 1974, it contacted the tenants in the building and

encouraged or caused them to vacate, and that it made statements to the press that the building "would" be taken through eminent domain proceedings. The City's conduct went beyond mere notification of a possible taking. The City caused the tenants to vacate and stated the property "would" be taken.

The record is replete with facts showing that, by August 20, 1974, official actions of the City had substantially deprived Maxey of rental income. Depriving a condemnee of rental income is a compensable taking. *Luber v. Milwaukee County,* 47 Wis.2d 271, 278, 177 N.W.2d 380 (1970).

In this case, where rental income was Maxey's only significant interest in the property, all, or substantially all, of the beneficial use of his property was taken from him by the stipulated date, August 20, 1974. The facts supporting this conclusion of law are undisputed. The trial judge correctly concluded that a taking had occurred prior to the filing of the petition for inverse condemnation.

Where we differ from the trial court is in its conclusion that the condemnor had exercised its powers prior to the commencement of the inverse condemnation action. The trial court did not specify exactly how or when the Redevelopment Authority exercised its condemnation powers, but the judge's opinion and the briefs filed on appeal by the lessors and the Redevelopment Authority demonstrate that the trial court concluded that the exercise of condemnation powers commenced with the making of the jurisdictional offer on July 15, 1976. Even acknowledging that the making of a jurisdictional offer is a step that must be undertaken prior to the exercise of direct condemnation powers, we cannot conclude that, by so doing, the condemnor "exercised" its powers.

Maxey argues that a property owner's right to commence an inverse condemnation procedure cannot be

thwarted unless the condemnor files its petition and lis pendens pursuant to sec. 32.06(7), Stats., before the inception of the landowner's action. Because the making of a jurisdictional offer is so preliminary and so tentative a step in the exercise of direct condemnation powers, we conclude that the making of the offer does not demonstrate that the condemnor has exercised its powers.

Initially, we point out that sec. 32.10, Stats., specifically contemplates that an inverse condemnation can proceed although a jurisdictional offer has been made. The following sentence in sec. 32.10, Stats., provides:

"If the court determines that the defendant is occupying such property of the plaintiff without having the right to do so, it shall treat the matter in accordance with the provisions of this chapter assuming the plaintiff has received from the defendant a jurisdictional offer and has failed to accept the same and assuming the plaintiff is not questioning the right of the defendant to condemn the property so occupied."

This language makes clear that a property owner may proceed with his inverse condemnation whether or not a jurisdictional offer has been received. We read that portion of the statute to provide that, where no jurisdictional offer has been made, the condemnee may bring his action "as if" there had been a jurisdictional offer; and, in addition, the implication of the language is that a property owner may pursue the sec. 32.10, Stats., inverse condemnation proceedings although he has in fact received and rejected a jurisdictional offer. Any other conclusion would overlook the obvious remedial purposes of sec. 32.10.

That statute is designed to protect property owners against the slothful actions of a condemnor which, having constructively taken an owner's property, is in no hurry to compensate the owner during a period when the prop-

erty's value may be steadily declining. Under secs. 32.06 (9) (a) and (10) (c), a condemnor is free to terminate condemnation proceedings without incurring any statutory liability to the landowner until it files a petition and lis pendens under sec. 32.06 (7). Thus, to allow the mere making of a jurisdictional offer to constitute the exercise of condemnation powers would deprive a property owner of any remedy and would leave the property owner completely helpless, irrespective of how long after the jurisdictional offer the condemnor finally decided to condemn or to abandon the project.

Moreover, under sec. 32.06 (3) and 32.06 (7), Stats., a condemnor *may* petition for condemnation after the rejection of the jurisdictional offer. The condemnor is not required to proceed with its condemnation merely because a jurisdictional offer has been made. If, as the trial court held, making a jurisdictional offer bars a property owner from bringing his own action, a condemnor would be free to make a low jurisdictional offer and then wait, perhaps for years, while the property values decline before commencing formal condemnation proceedings.

To follow to its logical conclusion the rationale of the trial court would be to compound the problems of condemnation blight pointed out in both *Howell Plaza I* and *II*. In those cases we quoted with approval the statement made by the trial judge in *Howell Plaza I* that:

" 'The advance planning necessary for public improvements often results in postponements and delays in condemnation proceedings. Long periods of time lapse between the initiation of a project and the actual award of compensation to the property owner. As this delay continues, property values in the area set off for the public improvement sometimes rapidly depreciate, because the tenants relocate in other areas and property owners are reluctant to spend money on repairs. There can be a substantial loss of financial return from such property, while the cost of its maintenance continues.

Such effects of proposed public improvements are called condemnation blight.'" 66 Wis.2d at 727–28 and 92 Wis.2d at 82.

The trial court erred when it dismissed Maxey's petition for inverse condemnation. Maxey was the owner of the property for condemnation purposes, a taking had occurred prior to the date of the commencement of Maxey's action, and the condemning authority had failed to exercise its powers at the time Maxey filed his petition under sec. 32.10, Stats.

The order of the trial court in Case No. 77–112 is reversed and the cause is remanded for further proceedings in the inverse condemnation action.

It is apparent—if as we hold herein that the inverse action should have proceeded—that the court was without authority to proceed on the direct condemnation action brought by the Redevelopment Authority of the City of Racine, which action is the subject of the appeal in Case No. 78–689. Because both the Circuit Court and the Condemnation Commission were without jurisdiction in that case, the appeal is dismissed and the cause remanded with directions to vacate the findings of the Circuit Court and of the Condemnation Commission.

However, we believe the factual and legal determinations of the Circuit Court in respect to the allocation of the proceeds of the condemnation award warrant our consideration, because the same issues will be germane to the disposition of the inverse condemnation action when it is reached in the trial court. Many of the facts that were adduced, both in the Condemnation Commission proceedings and in the Circuit Court proceedings are relevant to any further proceedings that may be held herein. The parties in open court at oral argument acknowledged the relevancy of at least some of these facts and findings; and, in the event they can agree, they may stipulate to the incorporation of the testimony and the

agreed findings for purposes of going forward with the inverse condemnation action.

Three issues were raised in the direct condemnation action which will apparently be relevant in further proceedings. They are: (1) The effect of the condemnation clause in the lease; (2) the effect of the provision with respect to failure to pay rent or taxes; and (3) the date to be used for valuing the property.

Because, on remand, the matter will be determined on inverse condemnation, we set forth the standards applicable to that proceeding. Applying the rules specified for direct condemnation actions in sec. 32.06(7), Stats., the Racine County Condemnation Commission valued the Baker Block Building as of September 24, 1976, the date on which the Redevelopment Authority filed a lis pendens.[3] We have determined that a direct condemnation could not be undertaken where the jurisdictional facts to establish a pending inverse condemnation have been shown. The question, therefore, is what is the date of valuation in the inverse condemnation proceeding.

It is a fundamental principle that private property cannot be taken for public use without just compensation being determined as of the date of taking. *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 474 (1973); *Kieselbach v. Commissioner of Inter-*

---

[3] We note that, even if a direct condemnation had been appropriate in this case, the lis pendens date was not the appropriate valuation date. Sec. 32.06(7), Stats. 1973, provides not that the date of the filing of the lis pendens shall be the date of the valuation, but that the date of evaluation "shall be the date the resolution is adopted by the local legislative body designating the boundaries of the proposed project area under s. 66.431(6)(b)(1)." This date was April 7, 1976. This is true even though that statute was repealed by ch. 410, Laws of 1975, effective June 12, 1976, for it remained in effect on the date of valuation, April 7, 1976.

*nal Revenue,* 317 U.S. 399 (1943). There is, however, substantial dispute between jurisdictions with respect to the date that a taking occurs. In *Schey Enterprises, Inc. v. State,* 52 Wis.2d 361, 190 N.W.2d 149 (1971), we pointed out that legislation has set an arbitrary point in some condemnation processes for determining the date of valuation. In most direct condemnation actions, the date arbitrarily fixed has been the date of filing the lis pendens. In inverse condemnations, however, no date for evaluating property is fixed. The statute merely provides:

"If the court determines that the defendant is occupying such property . . . without having the right to do so, it shall treat the matter in accordance with the provisions of this chapter . . . ." (Sec. 32.10, Stats.)

It is arguable that sec. 32.09, Stats., in conjunction with sec. 32.06(7), sets the valuation date as the date of filing of the lis pendens. The preamble to sec. 32.09 states:

"In all matters involving the determination of just compensation in eminent domain proceedings, the following rules shall be followed."

Subsection (1) of sec. 32.09, Stats., provides that the date of evaluation shall be as fixed by sec. 32.06(7). Sec. 32.06(7), Stats. 1975, provides: "The date of filing the lis pendens shall be the 'date of evaluation' of the property . . . ." Despite this language, it is apparent that the date of filing the lis pendens cannot rationally be used as the evaluation date in an inverse condemnation, for there is no requirement that a lis pendens be filed under sec. 32.10.

In addition, in contrast to direct condemnation actions, where the commencement of the proceedings and the simultaneous filing of a lis pendens may be fairly said to represent the date of taking, in an inverse condemna-

tion, the date of taking, by definition, is required to antedate the commencement of the proceedings and is a just jurisdictional prerequisite of the inverse condemnation action. A valuation on the date of filing, if it is to coincide with the commencement of the action, would therefore unjustly enrich the property owner if the value of the property appreciated following the taking or, in the usual case, would unfairly penalize him if the property's value were diminishing as a result of condemnation blight.

These factors have impelled the majority of the courts which have addressed the question to find the actual date of taking as the lawful and reasonable time at which to value property in inverse condemnations. *Department of Transportation v. Shaw,* 36 Ill. App.3d 972, 345 N.E.2d 153 (1976) ; *Faus v. City of Los Angeles,* 53 Cal. Rptr. 113, 122 (1966) ; *State Highway Comm. v. Stumbo,* 222 Ore. 62, 352 P.2d 478 (1960) ; 3 Nichols, *Eminent Domain,* sec. 8.1[4].

Moreover, it is the common law rule in Wisconsin that the date of valuation must be the date of taking, which date is to be fixed depending upon the date that the property was occupied prior to the institution of formal condemnation proceedings. *A. Gettelman Brewing Co. v. Milwaukee,* 245 Wis. 9, 13 N.W.2d 541 (1944) ; *Wisconsin Power & Light Co. v. Public Service Comm.,* 231 Wis. 390, 284 N.W. 586, 286 N.W. 392 (1939) ; *Riddle v. Lodi Telephone Co.,* 175 Wis. 360, 185 N.W. 182 (1921) ; *cf., Schey Enterprises, Inc. v. State,* 52 Wis.2d 361, 368–69, 190 N.W.2d 149 (1971).

In *Riddle v. Lodi Telephone Company,* this court considered a situation where the condemnor took the owner's property before the commencement of formal proceedings. The court distinguished conventional direct condemnation proceedings from those in which the condemn-

ing authority exercised dominion prior to the inception or the exercise of its condemnation powers. The court pointed out that different valuation dates should apply to the two types of condemnation proceedings. It said:

"It is a fundamental principle that the market value of property taken for a public use shall be ascertained as of the time of the taking. Our statute provides that the commissioners shall determine the 'damages sustained by the taking.' Where there has been no occupation of the premises, this time is ordinarily that of the award of damages. Where, however, there is an entry upon the property by the consent of the owner, express or implied, so that the appropriator is in lawful possession, the time as of which the damages shall be ascertained is the time when the premises were taken." 175 Wis. at 364.

The common law of Wisconsin, therefore, established that the date of valuation shall be the date of taking. Those portions of the eminent domain statutes which arguably could lead to the conclusion that a different date should be used, particularly the portion of the statute in reference to the date of filing the lis pendens, not only make no sense in the case of an inverse condemnation but also, as a matter of legislative intent, are of doubtful applicability. Eminent domain statutes are in derogation of the common law rules and must be strictly construed. It is an accepted axiom of law in Wisconsin that:

"Statutes are not to be construed as changing the common law unless the purpose to effect such change is clearly expressed therein. To have such effect 'the language [of the statute] must be clear, unambiguous and peremptory.'" *Wisconsin Bridge & Iron Co. v. Industrial Comm.*, 233 Wis. 467, 474, 290 N.W. 199 (1940).

The date of filing a lis pendens cannot be reasonably applied in an inverse condemnation as the valuation date,

and there is nothing in the statutory language which purports to have it clearly, unambiguously, and peremptorily apply to inverse condemnations.

Accordingly, we conclude that, in inverse condemnation cases, the common law has not been altered; and, as stated in *Riddle,* the date of evaluation must be the date of taking. That date is August 20, 1974, when, by the exercise of municipal authority, the City Council refused to grant a theater license for the property. On remand, then, in the course of the inverse condemnation proceedings, the property shall be valued as of that date.

Additionally, the fee owners-lessors argue that Maxey and his mortgagees are entitled to none of the proceeds of the condemnation award because of the following clause in the lease:

"If all the rights, titles, interests and estates of both the lessors and lessees in said demised premises and buildings and improvements thereon shall be sold in the exercise of the right of Eminent Domain in condemnation proceedings, for a public purpose, *such condemnation shall terminate the further liabilities of both the lessors and lessees under this lease,* but shall not relieve either the lessors or lessees from any liabilities which accrued prior to such condemnation." (Emphasis supplied.)

We conclude that the court erred when it interpreted the clause to completely deprive the lessee of any interest. It is well settled that a lessee has a property interest; and, when that interest is completely taken by a condemning authority, the lessee is entitled to compensation. 4 Nichols, *Eminent Domain* (Rev. 3d ed.), sec. 12.42, p. 12–764; sec. 32.01(2), Stats.

It is equally clear that a mortgagee's lien extends to any compensation made for the condemnation of mort-

gaged property. *Connell v. City of Kaukauna,* 164 Wis. 471, 159 N.W. 927, 160 N.W. 1035 (1917). 4 Nichols points out, sec. 12.36[1], that condemnation awards should be based on the value of the property as a whole as if there were only one owner, and it is only after there is a determination of the taken property's total value that it is apportioned among the various interests in the property. A leasehold is normally valued as the difference between the rental value of the premises at the time of taking and the rent due the lessors during the unexpired term. *See, Fiorini v. Kenosha,* 208 Wis. 496, 500, 243 N.W. 761 (1932) ; M. Friedman, *Preparation of Leases,* ch. 24, p. 74. Compensation is apportioned to the lessor for the taking of his reversionary interest and to the lessee for the taking of his leasehold. Where the leasehold is relatively long and rental values have substantially increased since the inception of the lease term, the lessee's share may exhaust the entire award. Friedman, *supra* at 76; *Nebraska v. United States,* 164 F.2d 866 (8th Cir. 1947), *cert. den.* 334 U.S. 815.

Accordingly, under ordinary circumstances, a lessee is entitled to some portion of the condemnation award. Nevertheless, by a properly drawn lease provision, a lessee may be barred from sharing in the proceeds. 2 Nichols, *Eminent Domain,* sec. 5.23[2], pp. 5–92–4, succinctly states the problem:

"It has become customary in drawing leases of valuable city property to insert a so-called 'condemnation clause'—a provision that, upon the taking by eminent domain of the whole or a part of the premises leased, the term shall come to an end. Under such a lease the tenant has no estate or interest in the property remaining after the taking to sustain a claim for compensation, although under some circumstances he may be entitled to recover for removal expenses, fixtures or other improvements. It has been held that the law does not look with favor on

clauses causing forfeiture of the lessee's interest on condemnation, hence, a lease covenant will be construed not to have that effect if its language and the circumstances possibly permit."

The question posed, then, in respect to the lease between Maxey and the fee owners is whether the language of the lease is sufficiently explicit to cause a forfeiture of the lessee's normal right to share in the compensation award. The clause quoted above merely provides that "such condemnation shall terminate the further liabilities of both the lessors and lessees under this lease . . . ."

In *United States v. Petty Motor Co.*, 327 U.S. 372 (1946), the condemnation clause provided: "[T]he Lessee shall not be entitled to any part of any award . . ." (at 376) That language is explicit, and it is abundantly clear why the United States Supreme Court, under that language, determined that the lessee was entitled to nothing. However, as stated by Nichols, a forfeiture of rights is abhorrent to the law, and one will not be found unless it is explicitly made so by the lease itself. Certainly, in this case we find no explicit abrogation of the lessee's rights, as set forth in *Petty*. If the parties to the instant lease had intended a forfeiture of the lessee's rights, a clause similar to the one referred to in *Petty* could have been used. To construe the words, "condemnation shall terminate the further liabilities of both the lessors and lessees" as working a forfeiture of Maxey's considerable interest in the condemned property is as strained as it is inequitable. The lease provision merely terminates the respective liabilities of the lessors and lessee. The clear intent of the provision is that liabilities to each other are terminated. There is nothing which purports to abridge the lessee's right to share in a just portion of the compensation upon condemnation.

The Wisconsin law, like the law generally, abhors a forfeiture unless stated in most explicit terms. This court stated in *Zuelke v. Gergo*, 258 Wis. 267, 273, 45 N.W.2d 690 (1951):

"There is also a rule which is entitled to serious consideration that when the terms of a contract are, or, by any act of parties under the contract, become indefinite, uncertain, and susceptible of two constructions, and by giving them one construction one of the parties would be subject to a forfeiture, and by giving them the other no such forfeiture would be incurred and no injustice would be done to the other party, the contract should be construed as not creating a forfeiture."

A good statement of the general premise for the construction of condemnation clauses of this nature was set forth in *Belmont Clothes, Inc. v. Pleet*, 229 Md. 462, 184 A.2d 731 (1962). Therein, the court, in construing the effect of a condemnation clause on the apportionment of the proceeds, said:

"In support of our conclusion in this case, it may be added that: 'The decisions show that the courts did not look with favor on clauses causing the forfeiture of the lessee's interest on condemnation, and that a lease covenant will be construed not to have that effect if its language and the circumstances possibly permit that construction.'" (at 472)

Following the general law applicable to condemnation clauses, it is clear that the lessors' intent to impose a forfeiture of Maxey's rights, if such were the intent, was not explicitly set forth in the condemnation clause. In accordance with this state's law abhorring forfeitures, we construe the lease not to have that effect. Maxey and his mortgagees are entitled to share in the proceeds of a condemnation award.

Additionally, it was argued in the abortive direct condemnation action that Maxey had forfeited his rights under the lease because he ceased paying rent after February 28, 1974, and failed to pay property taxes for the years 1973, 1974, and 1975. It is the position of the owners of the fee that, because of these defaults, Maxey defaulted in his lease and lost all rights to share in the proceeds prior to the date of valuation, the filing of the lis pendens, and the direct action condemnation suit. We have pointed out, however, that the taking occurred not on that date but on August 20, 1974. It is undisputed that, under the lease, Maxey had the right of redemption for a period of one year after default.[4] It is conceded by the parties that, under that right of redemption, he could not have lost his leasehold rights until February 28, 1975. This date, however, followed by more than six months the taking by the City when it refused to renew the theater license.

It is clear from the portion of the condemnation clause which is effective that, following the date of taking, all liabilities of the lessee, Maxey, to the lessors ceased. Maxey was not in irredeemable default on August 20, 1974; and, on that date, he was entitled to his proportionate share of the award, which must be determined after an appropriate valuation of his leasehold interest. Moreover, it should be noted that the City specifically struck the property from the tax rolls before Maxey's period of redemption had expired.

---

[4] "Paragraph XV

"It is further agreed that should the lessees fail or neglect to pay any rents, taxes, charges, insurance, or make any other payments required by a just interpretation of this lease, at the times herein specified, that the rights of the said lessees herein shall thereupon without further notice cease and determine; provided, however, that after the erection of the theater building by the lessees hereby covenanted to be erected, the said lessees shall have a period of one (1) year for the redemption of their leasehold interest from such default, or failure. . . ."

The normal rules of condemnation are involved in determining the continued effectiveness of the lease covenants to pay rent. The *Restatement of Property* 2nd (Tent. Draft. No. 2), sec. 7.1(1), provides that:

"If there is a taking by eminent domain of all of the leased property for all of the lease term, the lease is terminated."

As noted in 4 Nichols, *Eminent Domain,* sec. 12.42[1], p. 12–785:

"[I]t is generally held that when the entire leased parcel is taken by eminent domain the covenant to pay rent is discharged."

The property was taken by the Redevelopment Authority before any termination of the lease by reason of Maxey's default became effective.

The order of the trial court was entered in a direct condemnation action in which it did not have jurisdiction because of the continued vitality of Maxey's earlier commenced action for inverse condemnation. Accordingly, its orders in the direct action are wholly void, and that action must be dismissed. We also conclude that its findings were erroneous as a matter of law in respects set forth in this opinion.

Although this court does not give advisory opinions, it is apparent from the context of the record that the identical issues must be determined if the inverse condemnation action goes forward. We conclude that, in this unusual circumstance, our holdings in respect to matters of law raised in the direct condemnation action are the law of the case in the inverse condemnation proceeding to the extent that the same issues are raised therein and the same facts are pertinent to the decision.

*By the Court.*—The order in Case No. 77–112 is reversed and the cause is remanded for further proceedings consistent with this opinion. In Case No. 78–689, the appeal is dismissed and the cause is remanded to the circuit court with directions to dismiss the petition and to discharge the lis pendens.