# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP192-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, |
| | Plaintiff-Respondent-Petitioner, |
| | v. |
| | Chrystul D. Kizer, |
| | Defendant-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 398 Wis. 2d 697, 963 N.W.2d 136
PDC No:2021 WI App 46 - Published

| | |
|---|---|
| OPINION FILED: | July 6, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 1, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Kenosha |
| JUDGE: | David P. Wilk |

JUSTICES:
DALLET, J., delivered the majority opinion of the Court with respect to all parts except ¶¶27-29 & n. 9-11, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and KAROFSKY, JJ., joined, and an opinion with respect to ¶¶27-29 & n. 9-11, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion. ROGGENSACK, J., filed a dissenting opinion in which ZIEGLER, C.J., and HAGEDORN, J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *Timothy M. Barber*, assistant attorney general, with whom on the briefs was *Joshua L. Kaul*, attorney general. There was an oral argument by *Timothy M. Barber*.

For the defendant-appellant, there was a brief filed by *Katie R. York* and *Colleen Marion*, assistant state public defenders. There was an oral argument by *Katie R. York*.

An amicus curiae brief was filed by *Caitlin Kendall Noonan, Rebecca Donaldson, Erika Jacobs Petty,* and *Legal Action of Wisconsin, Inc.,* Milwaukee and *Lotus Legal Clinic, Inc.,* Brookfield, for Legal Action of Wisconsin, Inc. and Lotus Legal Clinic, Inc.

An amicus curiae brief was filed by *Naikang Tsao, Lynn Hecht Schafran, Jennifer M., Becker, Sigrid McCawley, Lindsey Ruff,* and *Foley & Lardner LLP,* Madison, *Legal Momentum,* New York City, and *Boies Schiller Flexner LLP*, New York City, for Legal Momentum, Wisconsin Coalition Against Sexual Assault, Harvard Law School Gender violence Program, Cornell Law School Gender Justice Clinic, Diverse & Resilient, Jewish Women International, Lovelace Consulting Services, Inc., National Alliance to End Sexual Violence, National Coalition Against Domestic Violence, Rights4Girls, Sanctuary for Families, The Institute to Address Commercial Sexual Exploitation, and World Without Exploitation.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP0192-CR
(L.C. No. 2018CF0643)

STATE OF WISCONSIN : IN SUPREME COURT

State of Wisconsin,

    Plaintiff-Respondent-Petitioner,

    v.

Chrystul D. Kizer,

    Defendant-Appellant.

**FILED**

**JUL 6, 2022**

Sheila T. Reiff
Clerk of Supreme Court

DALLET, J., delivered the majority opinion of the Court with respect to all parts except ¶¶27-29 & n. 9-11, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and KAROFSKY, JJ., joined, and an opinion with respect to ¶¶27-29 & n. 9-11, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion. ROGGENSACK, J., filed a dissenting opinion in which ZIEGLER, C.J., and HAGEDORN, J., joined.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 REBECCA FRANK DALLET, J. In Wisconsin, victims of human trafficking or child sex trafficking have "an affirmative defense for any offense committed as a direct result" of the

trafficking.  See Wis. Stat. § 939.46(1m) (2019-20).[1]  Chrystul
Kizer wants to rely on this defense when she is tried on charges
of first-degree intentional homicide and several other felonies
in connection with the death of the man she says trafficked her.
We do not decide whether Kizer may rely on this defense at
trial.  Instead, we decide two general questions regarding the
interpretation of § 939.46(1m) and the scope of the defense.
First, what does it mean for an offense to be "committed as a
direct result of the violation" of the human-trafficking
statutes?  And second, is § 939.46(1m) a complete defense to
first-degree intentional homicide or does it merely mitigate a
first-degree conviction to a second-degree one?

¶2  We hold that an offense is "committed as a direct
result" of a violation of the human-trafficking statutes if
there is a logical, causal connection between the offense and
the trafficking such that the offense is not the result, in
significant part, of other events, circumstances, or
considerations apart from the trafficking violation.  We also
hold that § 939.46(1m) is a complete defense to first-degree
intentional homicide.  Accordingly, we affirm the court of
appeals' decision.

I

¶3  This case is still in a pre-trial posture and we
therefore state the facts as described in the criminal

_____

[1] All subsequent references to the Wisconsin Statutes are to
the 2019-20 version unless otherwise indicated.

complaint. In June 2018, Kizer traveled from Milwaukee to the Kenosha home of the man she says trafficked her. Kizer allegedly admitted to detectives that after she arrived, she "had gotten upset and she was tired of [him] touching her," and shot him. Kizer then started a fire at the house and drove away in his car. She was subsequently charged with first-degree intentional homicide, operating a motor vehicle without the owner's consent, arson, possession of a firearm by a felon, and bail jumping.

¶4 At a pre-trial conference, Kizer's counsel suggested that her defense at trial would rest at least in part on § 939.46(1m). After the State argued that the defense was not available to Kizer, the circuit court[2] ordered briefing and argument on that issue and the scope of the defense. The circuit court determined that the defense "is available to [Kizer] so long as [she] is charged with one of the acts in §940.302(2) . . . and . . . the cause of the offenses listed in 940.302(2) was the victimization, by others, of" Kizer. That meant that Kizer could not rely on the defense, since she was

---

[2] The Honorable David P. Wilk of the Kenosha County Circuit Court presiding.

3

not charged with a violation of § 940.302(2), which prohibits human trafficking.[3]

¶5 The court of appeals granted Kizer's petition for leave to file an interlocutory appeal and reversed the circuit court's decision. See generally State v. Kizer, 2021 WI App 46, 398 Wis. 2d 697, 963 N.W.2d 136. There, as here, Kizer and the State agreed that the circuit court's interpretation of § 939.46(1m) was incorrect, since the defense applies to "any offense committed as a direct result of the violation of s. 940.302(2) or 948.051 without regard to whether anyone was prosecuted or convicted for the violation of s. 940.302(2) or 948.051." § 939.46(1m) (emphases added); see also Kizer, 398 Wis. 2d 697, ¶4. Before the court of appeals, however, the parties disagreed about what it means for an offense to be "committed as a direct result of the violation" of the human-trafficking statutes, as well as whether § 939.46(1m) is a complete or mitigating defense to first-degree intentional homicide. See Kizer, 398 Wis. 2d 697, ¶¶5, 7. The court of appeals held that, when determining whether to instruct a jury on the defense, circuit courts should consider whether there is "'some evidence'" that "the victim's offense arises relatively

---

[3] Although the circuit court analyzed § 939.46(1m) as if Kizer were a victim of human trafficking under § 940.302(2), Kizer maintains that she is a victim of child sex trafficking, which is prohibited by § 948.051. Because we analyze the meaning of § 939.46(1m) in the abstract, and not whether it applies to Kizer's particular circumstances, we do not decide whether she is a victim of human trafficking, child sex trafficking, or both.

immediately from the trafficking violation of which the victim is a victim, is motivated primarily by the trafficking violation, is a logical and reasonably foreseeable consequence of that violation, and is not in significant part caused by events, circumstances or considerations other than that violation." Kizer, 398 Wis. 2d 697, ¶15 (quoting State v. Schmidt, 2012 WI App 113, ¶¶8-9, 344 Wis. 2d 336, 824 N.W.2d 839). This list, the court of appeals emphasized, was non-exhaustive and simply intended to provide some guidance to circuit courts. See id. The court of appeals also concluded that § 939.46(1m) is a complete defense to first-degree intentional homicide. See id., ¶23. We granted the State's petition for review.

II

¶6 This case involves the interpretation of § 939.46(1m), which is a question of law that we review de novo. See, e.g., State v. Matthews, 2021 WI 42, ¶7, 397 Wis. 2d 1, 959 N.W.2d 640. "[S]tatutory interpretation begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry." State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. "The goal of statutory interpretation is to give the statutory text its 'full, proper, and intended effect.'" Matthews, 397 Wis. 2d 1, ¶9 (quoting Kalal, 271 Wis. 2d 633, ¶44). To that end, we "generally give words their common, everyday meaning, 'but we give legal terms of art their accepted

5

legal meaning.'" Id. (quoting Estate of Matteson v. Matteson, 2008 WI 48, ¶22, 309 Wis. 2d 311, 749 N.W.2d 557).

III

¶7 We begin with the full text of § 939.46(1m):

> A victim of a violation of s. 940.302(2) or 948.051 has an affirmative defense for any offense committed as a direct result of the violation of s. 940.302(2) or 948.051 without regard to whether anyone was prosecuted or convicted for the violation of s. 940.302(2) or 948.051.

Sections 940.302(2) and 948.051 prohibit, respectively, human trafficking and child sex trafficking. Thus, under § 939.46(1m), a victim of human trafficking or child sex trafficking has an affirmative defense "for any offense [the victim] committed as a direct result" of the trafficking offense, regardless of whether anyone is charged with or convicted of trafficking.

¶8 Section 939.46(1m) does not define what it means for an offense to be "committed as a direct result" of the trafficking offense. Nor does the statute state expressly whether it is a complete defense to first-degree intentional homicide or if it is a mitigating defense——a defense that, if successful, reduces a first-degree intentional homicide to a second-degree one. We address those two disputed issues in turn.

¶9 We do not decide, however, whether Kizer is entitled to a jury instruction on this defense at trial as to some or all of the charges against her. Both parties acknowledge that

6

regardless of how we interpret the defense in § 939.46(1m), it will be available to Kizer at trial only if she puts forth "some evidence" to support its application.  See State v. Johnson, 2021 WI 61, ¶17, 397 Wis. 2d 633, 961 N.W.2d 18.  If she puts forth such evidence, the burden will be on the State to prove beyond a reasonable doubt that the defense does not apply.  See Moes v. State, 91 Wis. 2d 756, 765-66, 284 N.W.2d 66 (1979).

A

¶10  We first analyze what it means for an offense to be "committed as a direct result of the violation" of the human-trafficking statutes.  See § 939.46(1m).  The State's argument comes in two parts.  First, it offers several different definitions of "direct result," including "the consequence of an action without any intervening circumstances, or without compromising or mitigating elements," "the primary, proximate, immediate cause, marked by the absence of intervening agency," and "both actual and proximate cause and immediacy related to trafficking."  Based on those definitions, the State contends that § 939.46(1m) applies only to an offense that is caused by the underlying trafficking crime and not by "superseding or intervening causes."  The State then combines its definitions of "direct result" with the next phrase in § 939.46(1m)——"direct result of the violation" of the trafficking statutes, see id. (emphasis added)——to conclude that the defense applies only to offenses that are "part of or in furtherance of the underlying trafficking violation."  This conclusion is important because,

7

in the State's view, the text of § 939.46(1m) does not create a defense that applies solely because an individual is a victim of human trafficking when she commits a crime. Rather, the defense applies only to offenses committed by the trafficking victim that are "part and parcel of the trafficking enterprise."

¶11 Kizer largely adopts the court of appeals' view that an offense is committed as a direct result of the violation of the human-trafficking statutes when it "arises relatively immediately from the trafficking violation of which the victim is a victim, is motivated primarily by the trafficking violation, is a logical and reasonably foreseeable consequence of that violation, and is not in significant part caused by events, circumstances or considerations other than that violation." Kizer, 398 Wis. 2d 697, ¶15. She suggests several reasons why this interpretation is more consistent than the State's with the text of § 939.46(1m).[4] For one thing, she argues that the State conflates "proximate cause" with "direct result," despite the two being distinct and unrelated. For

_____

[4] Kizer also argues that the State forfeited any objection to the court of appeals' interpretation of § 939.46(1m) by failing to raise that issue in its petition for review. We acknowledge that the State took substantially different positions in its briefing than it did in the petition for review. For example, the State asserted in its petition that § 939.46(1m) could never apply to a charge of first-degree intentional homicide but abandoned that position in its briefing, acknowledging that the defense could apply to such a charge, but "only in [the] rarest of cases." Nevertheless, and even assuming the State forfeited these arguments, they raise important issues that we choose to address. See State v. McKellips, 2016 WI 51, ¶47, 369 Wis. 2d 437, 881 N.W.2d 258.

8

another, she asserts that the State takes too narrow a view of the necessary relationship between the trafficking crime and the offense for which the victim claims the defense. Although § 939.46(1m) spells out the necessary connection——the offense for which the victim claims the defense must be a direct result of the trafficking offense——Kizer argues that the statute does not require as close a connection as the State claims.

¶12 Neither the words "direct result" nor the full phrase "committed as a direct result of the violation" of the human-trafficking statutes are defined in § 939.46(1m).[5] The lone other criminal statute that uses the phrase "direct result" also does not define it. See Wis. Stat. § 949.06(1) (explaining how restitution awards should be computed for "economic losses incurred as a direct result of an injury"). As a result, we look to the common, ordinary meaning of the phrase. See Kalal, 271 Wis. 2d 633, ¶45.

---

[5] Although other states have adopted statutes using somewhat similar language, those statutes do not define "direct result" either. See, e.g., Colo. Rev. Stat. § 18-7-201.3(1) (2021) ("A person charged with prostitution . . . which offense as committed as a direct result of being a victim of human trafficking, may assert as an affirmative defense that he or she is a victim of human trafficking."); Del. Code Ann. tit. 11, § 787(h) (2021-22) ("An individual charged with prostitution or loitering committed as a direct result of being a victim of human trafficking may assert as an affirmative defense that the individual is a victim of human trafficking."); Ga. Code Ann. § 17-10-21(a)(1) (2021) ("A defendant convicted of an offense and sentenced as a direct result of the defendant being the victim of an offense of trafficking under Code Section 16-5-46 may petition the court imposing the sentence to vacate such conviction.").

9

¶13 Defining "direct result" in the abstract is relatively straightforward as it is a common phrase with a familiar meaning. "Result" means "to proceed or arise as a consequence, effect, or conclusion."[6] Result, Merriam-Webster's Collegiate Dictionary (11th ed. 2009); Kizer, 398 Wis. 2d 697, ¶8 (noting that the word "result" means "'to proceed, spring, or arise as a consequence, effect, or conclusion: come out or have an issue.'" (quoting Result, Webster's Third New Int'l Dictionary (1993))); see also State v. McKellips, 2016 WI 51, ¶32, 369 Wis. 2d 437, 881 N.W.2d 258 (when a statute does not define terms we can rely on dictionary definitions). But § 939.46(1m) does not apply to just any result. As the court of appeals put it in this case, the legislature "tightened up ['result'] by preceding it with 'direct.'" Kizer, 398 Wis. 2d 697, ¶8. "Direct" is also a common word, with a well-understood meaning: "from the source without interruption or diversion" and "without an intervening agency or step." Direct, Merriam-Webster's Collegiate Dictionary, supra; see also Kizer, 398 Wis. 2d 697, ¶8 (quoting several relevant definitions of "direct" including "stemming immediately from a source" and "marked by absence of an intervening agency, instrumentality, or influence." (quoting Direct, Webster's Third New Int'l Dictionary, supra; Direct,

---

[6] The parties cite a handful of similar definitions. See Result, Merriam-Webster Dictionary, https://www.merriam-webster. com/dictionary/result ("[T]o proceed or arise as a consequence, effect, or conclusion."); Result, American Heritage Dictionary (2d ed. 1991) (defining "result" as "[t]he consequence of a particular action, operation, or course; [an] outcome.").

10

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/direct)).[7] A "direct result" is therefore a consequence, effect, or conclusion that stems immediately from its source.

¶14 Ordinary usage confirms that definition and also reveals that a consequence can be the direct result of more than one prior action. For instance, a car accident caused by a distracted driver is the direct result of the driver's inattention. So too is an accident in which a distracted driver crashes into a car that ran a red light; but that accident is also a direct result of the other driver running the red light. Those two causes might be treated differently in apportioning tort liability, see, e.g., Wis. Stat. § 895.045(1), but as a matter of ordinary language, the accident is a direct result of both. Ordinary usage also helps define the scope of which consequences are the direct result of a prior action. An ordinary person would never say that, in our car-accident example, the accident was a direct result of the driver having been born, even though that is a necessary precursor to the accident. Rather, the ordinary meaning of "direct result"

---

[7] As with "result," the parties cite several additional, mostly similar definitions of "direct." See Direct, Merriam-Webster Dictionary, https://www.merriam-webster. com/dictionary/direct ("[S]temming immediately from a source," "marked by absence of an intervening agency, instrumentality, or influence," and "characterized by close logical, causal, or consequential relationship."); Direct, Cambridge Dictionary, htt ps://dictionary.cambridge.org/us/dictionary/english/direct ("[W]ithout anyone or anything else being involved or between.").

connotes a tighter logical and causal relationship between events than simply the word "result."

¶15 Based on the above dictionary definitions of "direct" and "result," the ordinary usage of the phrase "direct result," and the language of § 939.46(1m), we conclude that an offense is "committed as a direct result of the violation" of the human-trafficking statutes if there is a logical, causal connection between the offense and the trafficking such that the offense is not the result, in significant part, of other events, circumstances, or considerations apart from the trafficking violation. Additionally, we emphasize that the offense need not be a foreseeable result of the trafficking violation and need not proceed "relatively immediately" from the trafficking violation. Kizer, 398 Wis. 2d 697, ¶15. In this respect, we disagree with the court of appeals' decision, which interpreted § 939.46(1m) to apply when an offense "arises relatively immediately from" and is a "logical and reasonably foreseeable consequence" of the trafficking violation.[8] See id. We see no basis in the language of the statute for imposing such categorical rules, which would run counter to the ordinary meaning of the phrase "direct result" and the nature of the

---

[8] The court of appeals also described an offense "committed as a direct result of the violation" of the trafficking statutes as one that is "motivated primarily by the trafficking violation." See Kizer, 398 Wis. 2d 697, ¶15. In our view, this notion——to the extent it is consistent with the language of § 939.46(1m)——is already incorporated in our reading of the statute.

12

underlying trafficking crime. Unlike many crimes, which occur at discrete points in time, human trafficking can trap victims in a cycle of seemingly inescapable abuse that can continue for months or even years. See, e.g., Wis. Dep't of Justice, 2019 Law Enforcement Assessment of Sex Trafficking in Wisconsin 17-18 (2019). For that reason, even an offense that is unforeseeable or that does not occur immediately after a trafficking offense is committed can be a direct result of the trafficking offense, so long as there is still the necessary logical connection between the offense and the trafficking.

¶16 Although the "direct result" language in § 939.46(1m) contains a causal component, we reject the State's arguments about proximate cause. The legislature has already specified that a different kind of causal relationship is required here: a direct result. In doing so, the legislature did not use or otherwise incorporate technical terms like proximate cause, which has a particular meaning in a distinct doctrinal context. See Fandrey ex rel. Connell v. Am. Fam. Mut. Ins. Co., 2004 WI 62, ¶15, 272 Wis. 2d 46, 680 N.W.2d 345 (describing "'public policy factors,' formerly referred to as 'proximate cause,'" and their application in the negligence context).

¶17 For similar reasons, we also reject the State's narrow view of causation more generally. The State argues that the defense in § 939.46(1m) is unavailable whenever an "intervening cause[] or agency" is involved. But an offense may be a direct result of a trafficking offense even if there are other causes at play, so long as the offense is not the result, in

13

significant part, of other events, circumstances, or considerations apart from the trafficking violation. This is in keeping with both the ordinary understanding of what a direct result is and how we have interpreted that phrase in other statutes. For example, in Waller v. American Transmission Co., 2013 WI 77, 350 Wis. 2d 242, 833 N.W.2d 764, we analyzed Wis. Stat. § 32.19(2)(e)1., which states that a person is displaced by a public project if they move "[a]s a direct result of a written notice" of the government's intent to acquire or its actual acquisition of the person's real property. § 32.19(2)(e)1. (emphasis added). We concluded that the "direct result" language required "a factual inquiry into the cause of the person's move," and concluded that property owners could move as a direct result of an offer to acquire property even if "they chose to move voluntarily and were not 'forced' to move." Waller, 350 Wis. 2d 242, ¶¶114, 116. Section 939.46(1m) likewise requires a factual inquiry into whether there is a logical, causal connection between the offense and the trafficking such that the offense is not the result, in significant part, of other events, circumstances, or considerations apart from the trafficking violation. It does not require, however, that the victim's offense be the result of only the trafficking offense, or that the victim be forced to commit the offense (as the State puts it) as "part of or in furtherance of the underlying trafficking violation."

¶18 This conclusion is also consistent with the only published decision from another state court interpreting similar

14

statutory language. See In re D.C., 60 Cal. App. 5th 915 (2021) (interpreting Cal. Penal Code § 236.23(a), which provides an affirmative defense to certain crimes if the defendant establishes that they were "coerced to commit the offense as a direct result of being a human trafficking victim at the time of the offense and had a reasonable fear of harm"). In that case, In re D.C., the defendant was a victim of human trafficking charged with carrying a concealed knife. Id. at 918. The defendant said that he carried the knife to protect himself against abduction by his trafficker——something that had happened before. Id. at 918-19. The California Court of Appeal concluded that the defendant's conduct could fall within the affirmative defense because someone could be coerced to commit an offense as a direct result of being a trafficking victim even if they did not "act at the behest of the trafficker" and the trafficker was unaware "that the victim was planning or had committed a crime." Id. at 920. The similar language in Wisconsin's statute supports a similar conclusion. "[C]ommitted as a direct result of the violation" of the human-trafficking statutes in § 939.46(1m) does not require that the trafficker be aware of the offense, or that it occur at the trafficker's behest in furtherance of the trafficking violation. It simply requires that the offense occur as a direct result of the violation of the trafficking statutes.

¶19 We agree with the State that the application of § 939.46(1m) requires more than the fact that a crime was committed by a trafficking victim, but our interpretation

15

already addresses that concern. One necessary element of the defense is, of course, that the defendant be "[a] victim of a violation of" the human-trafficking statutes. See § 939.46(1m). But § 939.46(1m) also requires that the offense be committed as a direct result of the violation of the trafficking statutes. And as we have interpreted that requirement, it is not enough to say simply that because the defendant is a victim of human trafficking, any offense they commit subsequently must be a direct result of the trafficking. The offense must bear a logical, causal connection to the underlying trafficking offense; it must be a direct result of the trafficking. Moreover, the same threshold applies to § 939.46(1m) as to other affirmative defenses——the defendant must produce some evidence on which a reasonable jury could find that the defense applies. See Johnson, 397 Wis. 2d 633, ¶17. Thus, our interpretation does not create the kind of blanket immunity for victims of human trafficking that the State fears.

¶20 In conclusion, we hold that an offense is "committed as a direct result of the violation" of the human-trafficking statutes if there is a logical, causal connection between the offense and the trafficking such that the offense is not the result, in significant part, of other events, circumstances, or considerations apart from the trafficking violation.

B

¶21 The remaining issue is whether § 939.46(1m) creates a complete defense to a charge of first-degree intentional

16

homicide or merely mitigates a conviction for first-degree intentional homicide to one for second-degree homicide.

¶22 The State's argument that the defense is mitigating rests on its reading of two related statutes, Wis. Stat. §§ 939.45(1) and 940.01(2)(d). Section 939.45 states that "[t]he fact that the actor's conduct is privileged, although otherwise criminal, is a defense to prosecution for any crime based on that conduct," including "[w]hen the actor's conduct occurs under circumstances of coercion . . . so as to be privileged under s. 939.46." § 939.45(1). Because § 939.46(1m) is part of § 939.46, the State concludes that it is one of the privileges referenced in § 939.45(1). The State then points to § 940.01(2), which lists the affirmative defenses that mitigate first-degree intentional homicide "to 2nd-degree intentional homicide." Among those mitigating defenses are the privileges listed in § 939.45(1). See § 940.01(2)(d) (stating that first-degree intentional homicide is mitigated to second-degree homicide when the "[d]eath was caused in the exercise of a privilege under s. 939.45(1)"). Thus, the State concludes that the § 939.46(1m) defense must be mitigating because it appears in the coercion statute, § 939.46.

¶23 Kizer, on the other hand, argues that § 939.46(1m) is a complete defense, in part because the history of the coercion statute does not support the State's conclusion. She points out that §§ 939.45 and 939.46 were adopted at the same time in 1955 and that at that time, § 939.46 contained only two subsections— subsec. (1) codified the common law coercion defense, while

17

subsec. (2) made clear that the same standard for coercion applied when "a married woman" claimed that "the alleged crime was committed by command of her husband." See Ch. 696, § 1, Laws of 1955; see also Wis. Stat. § 939.46(1)-(2) (1955-56). Kizer explains that § 939.46(2) (1955-56) simply placed a limitation on coercion defenses; it was not a defense in its own right, as § 939.46(1m) is. Thus, when it was adopted, the "circumstances of coercion" referred to in § 939.45(1) (1955-56) could have meant only the general coercion defense in § 939.46(1) (1955-56). And because § 939.46(1m) was not adopted until more than 50 years later, see 2007 Wis. Act 116, § 30, Kizer concludes that § 939.46(1m) is not one of the "circumstances of coercion" referenced in § 939.45(1).

¶24 A weakness in Kizer's argument is that Wis. Stat. § 990.001(5)(b) requires us to read statutory cross-references like those in § 939.45 as referring to all subsections currently in effect. "When a decimal-numbered statute of this state," like § 939.45(1), "contains a reference to another decimal-numbered statute of this state," like § 939.46, "the reference is to the current text of the statute referenced, and includes any change that has been inserted into . . . the referenced statute since the reference was first incorporated into the statute." § 990.001(5)(b). Thus, the fact that § 939.46(1m) did not exist when § 939.45(1) was enacted does not mean that § 939.45(1) does not refer to § 939.46(1m) now.

¶25 That said, the text of § 939.45(1) is not particularly clear, since it refers not to all of § 939.46 but to

18

"circumstances of coercion . . . under s. 939.46." Despite § 939.46 being titled "coercion," not every subsection of the statute is a coercion defense. Indeed, subsec. (2) is a limitation on coercion defenses, and subsec. (3) provides a non-coercion affirmative defense for so-called "straw purchases" of firearms. Not to mention that "titles . . . are not part of the statutes," § 990.001(6). Thus, not all of the conduct addressed in § 939.46 is necessarily covered by § 939.45(1)'s reference to "circumstances of coercion . . . under § 939.46." And that means that not all conduct in § 939.46 would mitigate a first-degree intentional homicide charge to a second-degree one. At least subsecs. (2) and (3) would not, and it is therefore unclear whether the same is true of subsec. (1m) as well.

¶26 Kizer's stronger argument is that the absence of any explicit mitigation language in § 939.46(1m) means that the statute creates a complete defense to first-degree intentional homicide. She points out that, unlike § 939.46(1m), many other statutory defenses expressly state that they mitigate a first-degree intentional homicide to a second-degree intentional homicide. See, e.g., Wis. Stat. § 939.47 (necessity is a complete defense "except that if the prosecution is for first-degree intentional homicide, the degree of the crime is reduced to 2nd-degree intentional homicide"); § 939.44(2) ("Adequate provocation is an affirmative defense only to first-degree intentional homicide and mitigates that offense to 2nd-degree intentional homicide."); § 940.01(2)(a)-(c) (specifying that adequate provocation, imperfect self-defense, and prevention of

19

a felony "mitigate the offense" of first-degree intentional homicide "to 2nd-degree intentional homicide"). The absence of similar language in § 939.46(1m) is notable because the only other statutory defense that could apply to a first-degree intentional homicide and that also contains no such mitigating language is perfect self defense, which is a complete defense to first-degree intentional homicide. See § 939.48(1). This context suggests that a defense is complete as to first-degree intentional homicide unless the statute contains express language regarding mitigation. See Kalal, 271 Wis. 2d 633, ¶46 (we interpret statutory language in context, "in relation to the language of surrounding or closely-related statutes."). And that suggestion is particularly compelling here because the subsection immediately preceding § 939.46(1m) states expressly that a general coercion defense, if successful, reduces a "first-degree intentional homicide[] . . . to 2nd-degree intentional homicide." See § 939.46(1); see also Augsburger v. Homestead Mut. Ins. Co., 2014 WI 133, ¶17, 359 Wis. 2d 385, 856 N.W.2d 874.

¶27 The State and Kizer's competing interpretations demonstrate that § 939.46(1m) is ambiguous. It is "capable of being understood by reasonably well-informed persons in [at least] two . . . senses": either as a complete defense to first-degree intentional homicide or as a defense that mitigates a first-degree intentional homicide to a second-degree one. See Kalal, 271 Wis. 2d 633, ¶47. When an ambiguity exists in a criminal statute, we apply the rule of lenity to resolve the

20

ambiguity in the defendant's favor unless the legislative history clarifies the statute's meaning.[9] See State v. Luedtke, 2015 WI 42, ¶73, 362 Wis. 2d 1, 863 N.W.2d 592; State v. Cole, 2003 WI 59, ¶67, 262 Wis. 2d 167, 663 N.W.2d 700. We do so "to avoid usurping the function of the legislature" and to ensure that statutes "provide the public with fair notice of prohibited conduct."[10] See State v. Quintana, 2008 WI 33, ¶66, 308 Wis. 2d 615, 748 N.W.2d 447.

---

[9] We recognize that there is some variation across our cases and the federal courts as to when the rule of lenity applies. See, e.g., State v. Guarnero, 2015 WI 72, ¶27, 363 Wis. 2d 857, 867 N.W.2d 400 (stating that the rule applies when there is a "'grievous ambiguity' or uncertainty" in a statute's meaning after "considering statutory language, context, structure and purpose" (quoting United States v. Castleman, 572 U.S. 157, 173 (2014))); Moskal v. United States, 498 U.S. 103, 108 (1990) ("[W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute." (emphasis in original) (quoted source omitted)); see also Shon Hopwood, Restoring the Historical Rule of Lenity as a Canon, 95 N.Y.U. L. Rev. 918, 924-31 (2020) (reviewing the various historical and contemporary formulations of the rule of lenity). In this case, though, none of those variations would alter our conclusion.

[10] We acknowledge that the use of legislative history to clarify an ambiguous criminal statute may be at odds with the fair-notice purpose of the rule of lenity. Nevertheless, since at least the 1970s, our cases——with the exception of Guarnero, discussed previously——have applied the rule of lenity only after concluding that the legislative history did not clear up an ambiguity. See, e.g., State v. Wilson, 77 Wis. 2d 15, 26-27, 252 N.W.2d 64 (1977); see also State v. Setagord, 211 Wis. 2d 397, 415, 565 N.W.2d 506 (1997). And Guarnero did not overrule those cases. See 363 Wis. 2d 857, ¶¶26-27. In any case, revisiting these precedents is not necessary to resolve this case, since, as discussed below, the legislative history does not clarify the meaning of § 939.46(1m).

¶28 The legislative history of § 939.46(1m) does not answer whether the statute creates a complete or mitigating defense to first-degree intentional homicide. Indeed, there is no legislative history at all on the mitigation question. The drafting file for the Senate bill contains both a Legislative Reference Bureau memo and a "model state anti-trafficking criminal statute," but neither address whether § 939.46(1m) is a mitigating or complete defense. In addition, the parties have not pointed us to any other extrinsic source that sheds light on the question, and we have not found any either.[11]

¶29 Accordingly, we apply the rule of lenity, and conclude that § 939.46(1m) is a complete defense to a charge of first-degree intentional homicide. See Cole, 262 Wis. 2d 167, ¶68.

---

[11] The dissent fails to explain why common law coercion somehow helps resolve the issue. For one thing, common law coercion was not a defense to homicide at all; it was neither a mitigating nor a complete defense. See, e.g., Joshua Dressler, Exegesis of the Law of Duress: Justifying the Excuse and Searching for its Proper Limits, 62 S. Cal. L. Rev. 1331, 1370 (1989). Given that, it is not clear why the common law's treatment of coercion should somehow mean that § 939.46(1m) must be a mitigating defense. The only reason the general coercion defense in § 939.46(1) is mitigating is because the legislature broke with the common law rule. See §§ 939.46(1), 939.45(1). Moreover, the legislature codified § 939.46(1m) separately from the general coercion defense in § 939.46(1) and without referring to "coercion" at all and without specifying that it is a mitigating defense to first-degree intentional homicide. Indeed, as the dissent points out, the legislature specifically rejected proposed model legislation referring to "coercion" when it adopted the statute. See dissent, ¶75. For these reasons, common law coercion is irrelevant to our analysis.

22

IV

¶30 We hold that an offense is "committed as a direct result" of a violation of the human-trafficking statutes if there is a logical, causal connection between the offense and the trafficking such that the offense is not the result, in significant part, of other events, circumstances, or considerations apart from the trafficking violation. We further hold that § 939.46(1m) is a complete defense to a charge of first-degree intentional homicide. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶31 REBECCA GRASSL BRADLEY, J. *(concurring).* "[A]ny reasonable doubt about the application of a penal law must be resolved in favor of liberty." Wooden v. United States, 595 U.S. __, 142 S. Ct. 1063, 1081 (2022) (Gorsuch, J., concurring). As Justice Patience Drake Roggensack's well-reasoned dissent demonstrates, reasonable minds may differ on whether Wis. Stat. § 939.46(1m) provides a complete defense for trafficking victims charged with first-degree intentional homicide or merely mitigates a conviction to second-degree intentional homicide. Ascertaining the meaning of the Wisconsin Statutes to resolve this issue requires deciphering a labyrinth of cross-referenced provisions, an undertaking the Wisconsin Supreme Court is typically well-equipped to perform. In this case, however, that exercise produced analytical disagreement, generating two reasonable constructions of governing statutes. I join the majority/lead opinion (in part)[1] rather than the dissent because the rule of lenity demands judgment in the defendant's favor. Id.

¶32 I depart from the dissenting opinion because making sense of the applicable statutes on the issue presented befuddles even supreme court justices. When it comes to laws imposing criminal punishment, the text of the law must convey the consequences of criminal conduct "in terms an ordinary person can understand." Id. at 1082. If "uncertainty exists" because an ordinary person cannot unravel the web of complexity

---

[1] I do not join the majority/lead opinion's discussion of the rule of lenity, paragraphs 27-29 and accompanying footnotes.

created by the legislature, "the law gives way to liberty." Id. If supreme court justices are unable to definitively discern the meaning of statutes, how could an ordinary person? "[A] fair system of laws requires precision in the definition of offenses and punishments. The less the courts insist on precision, the less the legislatures will take the trouble to provide it." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 301 (2012).

¶33 I depart from the majority/lead opinion because it elevates legislative history over a rule of statutory construction predating the founding. The majority/lead opinion says, "[w]hen an ambiguity exists in a criminal statute, we apply the rule of lenity to resolve the ambiguity in the defendant's favor unless the legislative history clarifies the statute's meaning." Majority/Lead op., ¶27 (citing State v. Luedtke, 2015 WI 42, ¶73, 362 Wis. 2d 1, 863 N.W.2d 592; State v. Cole, 2003 WI 59, ¶13, 262 Wis. 2d 167, 663 N.W.2d 700). Consulting legislative history before applying the rule of lenity is in error. "For the freedom of our constitution will not permit, that in criminal cases a power should be lodged in any judge, to construe the law otherwise than according to the letter." Introduction, William Blackstone, Commentaries *92. We do not "possess the authority to punish individuals under ambiguous laws in light of our own perceptions about some piece of legislative history or the statute's purpose." Wooden, 142 S. Ct. at 1085. If "the traditional tools of statutory interpretation yield no clear answer, the judge's next step

2

isn't to legislative history . . . . The next step is to lenity." Id. at 1085-86; see also Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994) ("There are, we recognize, contrary indications in the statute's legislative history. But we do not resort to legislative history to cloud a statutory text that is clear. Moreover, were we to find § 5322(a)'s 'willfulness' requirement ambiguous as applied to § 5324, we would resolve any doubt in favor of the defendant." (citations omitted)).

¶34 The majority/lead opinion cites outdated cases in support of its consultation of legislative history.[2] In State v. Luedtke, 362 Wis. 2d 1, ¶73, this court declined to apply the rule of lenity because it deemed the statute under consideration unambiguous. In a single paragraph disposing of the issue, the court merely quoted State v. Cole for the proposition that the rule of lenity applies only if the statute is ambiguous and the court is "unable to clarify the intent of the legislature by resort to legislative history." Luedtke, 362 Wis. 2d 1, ¶73 (quoting Cole, 262 Wis. 2d 167, ¶67). Cole is a pre-Kalal case

---

[2] The majority/lead opinion acknowledges "that the use of legislative history to clarify an ambiguous criminal statute may be at odds with the fair-notice purpose of the rule of lenity"; however, it declines to relieve this tension. Majority/Lead op., ¶27 n.10. "[I]t is this court's function to develop and clarify the law." State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 436, 424 N.W.2d 385 (1988); see also Cook v. Cook, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997) (noting this court has been "designated by the constitution and the legislature as a law declaring court" (quoting State ex rel. La Crosse Trib. v. Cir. Ct. for La Crosse Cnty., 115 Wis. 2d 220, 229-30, 340 N.W.2d 460 (1983))). In fulfilling that function, this court has a duty to independently research, analyze, and interpret the law on behalf of the nearly 6 million people of Wisconsin.

3

reflecting an approach to statutory construction focused on what the legislature "intended." See Cole, 262 Wis. 2d 167, ¶13 ("The principal objective of statutory interpretation is to ascertain and give effect to the intent of the legislature."). In Kalal, this court rejected that approach and joined the judicial mainstream in adopting a method of statutory interpretation focused on the meaning of the text. State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110.

¶35 In at least one post-Kalal case, the court analyzed the applicability of the rule of lenity without any mention of legislative history. State v. Guarnero, 2015 WI 72, ¶27, 363 Wis. 2d 857, 867 N.W.2d 400. Although the majority/lead opinion acknowledges Guarnero, it effectively declares it an outlier. More accurately, Guarnero conformed this court's jurisprudence on lenity to the prevailing method of statutory interpretation, in which legislative history plays no part.

¶36 "Regardless, stare decisis is a judicially-created policy and 'not an inexorable command;' for this reason, we will overturn precedent if it is objectively wrong." Friends of Frame Park, U.A. v.  of Waukesha, 2022 WI __, __ Wis. 2d __, ¶64, __ N.W.2d __ (Rebecca Grassl Bradley, J., concurring) (quoting Johnson Controls, Inc. v. Emps. Ins. of Wausau, 2003 WI 108, ¶97, 264 Wis. 2d 60, 665 N.W.2d 257). "Historically, the judiciary has prioritized declaring the law correctly over perpetuating errors in judgment in the name of stability in the law." Id. We should do so in this case.

4

¶37 "Changes or developments in the law have undermined the rationale behind" consulting legislative history to resolve statutory ambiguity before applying lenity. See State v. Roberson, 2019 WI 102, ¶50, 389 Wis. 2d 190, 935 N.W.2d 813 (quoting Bartholomew v. Wis. Patients Comp. Fund & Compcare Health Servs. Ins. Corp., 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 216). In Kalal, this court rejected intentionalism. "Kalal was a 'watershed decision in the modern history of the Wisconsin Supreme Court' and is Wisconsin's 'most cited case of modern times.'" Clean Wis., Inc. v. Wis. Dep't of Nat. Res., 2021 WI 71, ¶86, 398 Wis. 2d 386, 961 N.W.2d 346 (Rebecca Grassl Bradley, J., dissenting) (quoting Daniel R. Suhr, Interpreting Wisconsin Statutes, 100 Marq. L. Rev. 969, 969-70 (2017)). "'Kalal transformed statutory interpretation in Wisconsin' and 'shift[ed] state courts from a vaguely intentionalist interpretive method' to a 'uniform method' focusing upon the plain meaning of the words actually enacted into law." Id. (quoting Suhr, Interpreting Wisconsin Statutes, at 970) (modification in the original).

¶38 As Kalal recognized, "[i]t is the enacted law, not the unenacted intent, that is binding on the public." Kalal, 271 Wis. 2d 633, ¶44. This is the same premise underlying the rule of lenity. As the United States Supreme Court has acknowledged, "it is not likely that a criminal will carefully consider the text of the law before he murders[.]" McBoyle v. United States, 283 U.S. 25, 27 (1931). Nevertheless, a fair justice system requires "that a fair warning should be given to the world in

5

language that the common world will understand, of what the law intends to do if a certain line is passed." Id. While the notion that statutes "give adequate notice to the citizen is something of a fiction, . . . albeit one required in any system of law," this "necessary fiction descends to needless farce when the public is charged even with knowledge of Committee Reports."[3] United States v. R.L.C., 503 U.S. 291, 309 (1992) (Scalia, J., concurring). The rule of law cannot countenance any "justification for extending the 'necessary fiction' that citizens know the law . . . to such extralegal materials." Id. at 312 (Thomas, J., concurring). Plainly, "defendants cannot be presumed to be on notice of information present only in the legislative record[.]" Sarah Newland, Note, The Mercy of Scalia: Statutory Construction and the Rule of Lenity, 29 Harv. C.R.-C.L. L. Rev. 197, 213 (1994). Examining legislative history to resolve an ambiguity in a criminal statute is incompatible with Kalal and the purpose of the rule of lenity.

---

[3] Often, many members of the legislature are not even familiar with a bill's historical materials:

> The notion that you can pluck statements from a couple of legislators or even from a committee report, which is usually written by some teenagers, and . . . very often not even read by the committee, much less read by the whole House, much less less read by the other House, . . . [and presume the statements] somehow [are] reflective of the intent of the whole Congress and of the President . . . it truly is the last surviving fiction in American law.

Clean Wis., Inc. v. Wis. Dep't of Nat. Res., 2021 WI 71, ¶90, 398 Wis. 2d 386, 961 N.W.2d 346 (Rebecca Grassl Bradley, J., dissenting) (quoting Hoover Inst., Uncommon Knowledge with Justice Antonin Scalia, YouTube, at 17:40 (Oct. 30, 2012), https://www.youtube.com/watch?v=DaoLMW5AF4Y).

¶39 Although legislative history may play a limited role in confirming a plain meaning statutory interpretation, "it is not consistent with the rule of lenity to construe a textually ambiguous penal statute against a criminal defendant on the basis of legislative history." R.L.C., 503 U.S. at 307 (Scalia, J., concurring); see also Crandon v. United States, 494 U.S. 152, 160 (1990) ("Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text.").  If the rule of lenity requires legislative clarity in defining crime and punishment, nothing in the legislative history may "cause[] the criminal law to be stricter than the text of the law displays." R.L.C., 503 U.S. at 308.  While we presume the people's familiarity with the law,[4] we do not expect citizens to consult legislative history in order to ensure their conduct conforms with the rules prescribed by the legislature.

¶40 Applying the rule of lenity upon determining a criminal statute is ambiguous reflects a proper exercise of judicial restraint, reserving the amendment of unclear statutes for the legislature. Newland, The Mercy of Scalia, at 203.  For courts to instead explore legislative history to divine what the

---

[4] "[I]gnorance of the law is no excuse in any country.  If it were, the laws would lose their effect, because it can be always pretended." From Thomas Jefferson to André Limozin, 22 December 1787, Founders Online, National Archives, https://founders.archives.gov/documents/Jefferson/01-12-02-0460. [Original source: The Papers of Thomas Jefferson, vol. 12, 7 August 1787–31 March 1788, ed. Julian P. Boyd. Princeton: Princeton University Press, 1955, pp. 450–51.]

7

legislator "intended" "risk[s] the possibility that judges rather than legislators will control the power to define crimes and their punishments." Wooden, 142 S. Ct. at 1086. "[L]egislative history can never provide assurance against" courts defining the criminal law rather than the legislature. R.L.C., 503 U.S. at 309. Limiting judicial review to declaring what the law says rather than what legislators may have intended, but did not write, is fundamental to the separation of powers. "To determine that a case is within the intention of a statute, its language must authorise us to say so." United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 96 (1820).

¶41 Legislative history crept into judicial opinions only in the 20th century; until then, "[f]rom the beginnings of the republic, American law followed what is known as the 'no-recourse doctrine'——that in the interpretation of a text, no recourse may be had to legislative history." Scalia & Garner, Reading Law, at 369. The defects and dangers of using legislative history as a tool for interpretation have been well documented. See, e.g., id. at 369-90. In contrast, the rule of lenity "antedates both state and federal constitutions," id. at 297, and "became a widely recognized rule of statutory construction in the Republic's early years." Wooden, 142 S. Ct. at 1082. In 1820, Chief Justice John Marshall explained its origins: "The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of

8

punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment." Wiltberger, 18 U.S. at 95.

¶42 The rule of lenity does not apply every time a court must unravel complex statutes; if it did, the court would adopt any plausible statutory interpretation favoring the defendant's case, in every case. Although the United States Supreme Court has framed the threshold for its application differently in different cases, the rule of lenity should apply only if, after exhausting "all legitimate tools of interpretation . . . , 'a reasonable doubt persists.'" Scalia & Garner, Reading Law, at 299 (quoting Moskal v. United States, 498 U.S. 103, 108 (1990) (per Marshall, J.)); see also Wooden, 142 S. Ct. at 1081. In this case, notwithstanding earnest application of the canons of statutory construction, the members of this court reach different interpretations, producing reasonable doubt as to which reading is correct. The issue of whether Wis. Stat. § 939.46(1m) provides a complete defense for trafficking victims charged with first-degree intentional homicide or merely mitigates a conviction to second-degree intentional homicide "is eminently debatable——and that is enough, under the rule of lenity, to require finding for" the defendant in this case. Smith v. United States, 508 U.S. 223, 246 (1993) (Scalia, J., dissenting).

¶43 Because "the majority of statutes are clear in their prescriptions," the United States Supreme Court "often rejects

9

the use of the rule of lenity based on statutory clarity." Newland, The Mercy of Scalia, at 211 n.67. This is true regarding the Wisconsin statutes as well. The rule of lenity may be rarely used,[5] but reasonable doubt over the meaning of Wis. Stat. § 939.46(1m) as applied in this case compels a resolution in the defendant's favor.

---

[5] The rare application of the rule of lenity means our opportunities for review will come infrequently, yet another reason the court should ensure it declares the law correctly in this case.

¶44 PATIENCE DRAKE ROGGENSACK, J. *(dissenting)*. In accord with the common law principle that coercion is not a complete defense to first-degree intentional homicide as well as the text and surrounding context of Wis. Stat. § 939.46(1m), I conclude that § 939.46(1m)'s trafficking defense, which is grounded in coercion, is not a complete defense to first-degree intentional homicide. Rather, it comes within § 939.46(1) and has the potential to mitigate the charge of first-degree intentional homicide to second-degree intentional homicide. The majority/lead opinion errs because its interpretation of § 939.46(1m) abrogates the common law by making coercion a complete defense to first-degree intentional homicide and ignoring the context in which the legislature placed § 939.46(1m). Accordingly, I respectfully dissent.

## I. BACKGROUND[1]

¶45 Chrystul Kizer was charged with first-degree intentional homicide, operating a motor vehicle without the owner's consent, arson, possession of a firearm by a felon, and bail jumping. These charges stemmed from Kizer's alleged murder of a man who allegedly had been sex trafficking her. According to the criminal complaint, Kizer travelled from Milwaukee to Kenosha where she shot her trafficker. Following the shooting, Kizer started a fire at the man's home and drove off in his car.

¶46 At pre-trial, Kizer and her counsel sought to rely on Wis. Stat. § 939.46(1m), which grants victims of human

---

[1] The majority/lead opinion ably sets forth relevant facts; therefore, I provide only additional facts necessary to understand my opinion that follows.

trafficking "an affirmative defense for any offense committed as a direct result" of the trafficking. See § 939.46(1m). After briefing and argument on this issue, the circuit court concluded that Kizer could not rely on the defense. Kizer moved for interlocutory appeal, which motion the court of appeals granted. Following further argument and briefing, the court of appeals reversed the circuit court. As part of its reversal, the court of appeals concluded that § 939.46(1m) is a complete defense to first-degree intentional homicide. We granted the State's petition for review.

## II. DISCUSSION

### A. Standard of Review

¶47 "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. Statutory interpretation begins with the language of the statute. If the meaning of the words are plain and unambiguous, the court's inquiry ends and there is no need to consult extrinsic sources of interpretation, such as legislative history. Id., ¶¶45, 46.

¶48 In addition to the plain words of the text, "[c]ontext is important to meaning. So, too, is the structure of the statute in which the operative language appears." Id., ¶46. Therefore, rather than in isolation, "statutory language is interpreted in the context in which it is used; . . . in relation to the language of surrounding or closely-related

2

statutes; . . . to avoid absurd or unreasonable results; . . . [and] read where possible to give reasonable effect to every word, in order to avoid surplusage." Id. "Statutes are closely related when they are in the same chapter, reference one another, or use similar terms." State v. Reyes Fuerte, 2017 WI 104, ¶27, 378 Wis. 2d 504, 904 N.W.2d 773 (citing City of Janesville v. CC Midwest, Inc., 2007 WI 93, ¶24, 302 Wis. 2d 599, 734 N.W.2d 428).

¶49 It is consistent with the plain-meaning rule "to consider the intrinsic context in which statutory language is used; a plain-meaning interpretation cannot contravene a textually or contextually manifest statutory purpose." Kalal, 271 Wis. 2d 633, ¶49. However, in "construing or interpreting a statute the court is not at liberty to disregard the plain, clear words of the statute." Id., ¶46. Nor are courts permitted to read words into the statute that the legislature did not insert. Dawson v. Town of Jackson, 2011 WI 77, ¶42, 336 Wis. 2d 318, 801 N.W.2d 316.

### B. The Majority/lead Opinion

¶50 The State's argument that Wis. Stat. § 939.46(1m) mitigates first-degree intentional homicide to second degree, rather than providing a complete defense, focuses on following the links among statutory cross references.[2] Following this chain, the State argues that the trafficking defense is limited by the provision of Wis. Stat. § 940.01(2)(d), which provides that the listed affirmative defenses mitigate a first-degree

---

[2] See Section II.D.

intentional homicide charge to a second-degree charge. The majority/lead ignores the effect of the common law and disagrees with the State's contention. The majority/lead asserts that the absence of explicit mitigation language in § 939.46(1m) creates a complete defense to first-degree intentional homicide.[3]

¶51 In arriving at this conclusion, the majority/lead compares Wis. Stat. § 939.46(1m) with other statutory defenses that explicitly state that they mitigate the charge to second-degree intentional homicide.[4] Ultimately, the majority/lead opinion declares that this "suggests that a defense is complete as to first-degree intentional homicide unless the statute contains express language regarding mitigation."[5]

¶52 Yet, in doing this, the majority/lead errs by implementing an interpretation of Wis. Stat. § 939.46(1m) that is in derogation of the common law without the unambiguous and clearly expressed legislative purpose to do so. Because no such purpose was expressed by the statute, § 939.46(1m) must be interpreted so as to comport with the common law. See Strenke v. Hogner, 2005 WI 25, ¶28, 279 Wis. 2d 52, 694 N.W.2d 296 ("A statute must be interpreted in light of the common law and the scheme of jurisprudence existing at the time of its

---

[3] Majority/lead op., ¶26.

[4] Id. (citing Wis. Stat. § 939.47 (necessity is a complete defense "except that if the prosecution is for first-degree intentional homicide, the degree of the crime is reduced to 2nd-degree intentional homicide")).

[5] Id. (citing State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110).

4

enactment."). Therefore, I conclude that the trafficking defense is limited by the chain of statutory cross references which is in accord with the common law and, therefore, results in mitigation of a first-degree intentional homicide charge to a second-degree charge.

## C. Abrogation of the Common Law

¶53 It is helpful to review the effect of common law on statutory interpretation. I begin by noting that it is axiomatic that a statute does not abrogate a rule of common law unless the abrogation is clearly expressed and leaves no doubt of the legislature's purpose. Fuchsgruber v. Custom Accessories, Inc., 2001 WI 81, ¶25, 244 Wis. 2d 758, 628 N.W.2d 833 (quoting Kranzush v. Badger State Mut. Cas. Co., 103 Wis. 2d 56, 74, 307 N.W.2d 256, 266 (1981)). A statute does not change the common law unless the legislative purpose to do so is clearly expressed in the language of the statute. Maxey v. Redevelopment Auth. of Racine, 94 Wis. 2d 375, 399, 288 N.W.2d 794 (1980). To accomplish a change in the common law, "the language [of the statute] must be clear, unambiguous and peremptory." Id. (quoting Wis. Bridge & Iron Co. v. Indus. Comm'n, 233 Wis. 467, 474, 290 N.W. 199 (1940)).

## 1. Coercion Generally[6]

¶54 Coercion occurs when a "threat by a person other than the actor's coconspirator[7] . . . causes the actor reasonably to believe that his or her act is the only means of preventing imminent death or great bodily harm to the actor or another and which causes him or her so to act." State v. Keeran, 2004 WI App 4, ¶5, 268 Wis. 2d 761, 674 N.W.2d 570 (quoting Wis. Stat. § 939.46(1) (2001-02)). This privilege to act provides a complete common law defense to any crime except first-degree intentional homicide. Id.; see also People v. Anderson, 50 P.3d 368, 370-75 (2002) (tracing history of coercion at common law).

---

[6] Initially, an examination of the coercion defense, as well as its application to the specific crime of sex trafficking, will be helpful to our discussion.

[7] A conspiracy "commences with an agreement between 2 or more persons to direct their conduct toward the realization of a criminal objective and each member of the conspiracy must individually and consciously intend the realization of the particular criminal venture. Additionally, each conspirator must have an individual stake in the conspiracy." Bergeron v. State, 85 Wis. 2d 595, 613, 271 N.W.2d 386 (1978). Regarding the intent required to be deemed a conspirator, courts have described the need for a "voluntary" association and intention to commit the particular criminal venture. United States v. Wroblewski, 105 F.2d 444, 448 (7th Cir. 1939) (requiring evidence of "two or more persons, in voluntary cooperation," to prove a conspiracy). Traffickers form emotional bonds with their victims and, through ever-present abuse and control, manipulate them to commit acts they would not otherwise choose to do. As Legal Action of Wisconsin and LOTUS Legal Clinic explained in their brief to this court, "the line between 'choice' and 'force' can [quickly] erode" in trafficking relationships. Kizer says her association with her trafficker stems from such a relationship.

¶55 Coercion and duress[8] "are similar in substance" to self-defense. United States v. Waller, 605 F. App'x 333, 336 (5th Cir. 2015). "Duress, like the related, and often overlapping, defenses of self-defense and necessity, is a form of the affirmative defense of justification." United States v. Posada-Rios, 158 F.3d 832, 873 (5th Cir. 1998). Often described as "lesser evil" defenses, both duress and self-defense "rest[] on the belief that a person facing harm is justified in performing an act, otherwise illegal, less injurious than the impending loss." United States v. Haynes, 143 F.3d 1089, 1091 (7th Cir. 1998); see also Model Penal Code § 3.02 (collecting these defenses under the rubric "justification" and "choice[s] of evil"). While differences exist based on the source of the threat, these differences are often in nomenclature rather than in the "nature of the justification." Id.

¶56 Coercion, as a defense, is "limited to the most severe form of inducement" and requires a finding "under the objective-reasonable man test, with regard to the reasonableness of the actor's beliefs that he is threatened with immediate death or great bodily harm with no possible escape other than the commission of a criminal act." State v. Amundson, 69 Wis. 2d 554, 568, 230 N.W.2d 775 (1975). Specifically, in trafficking cases, courts around the country have concluded that various realities that victims are forced to endure at the hands of the

---

[8] Courts often use the terms "coercion" and "duress" interchangeably when speaking of circumstances in which a victim is justified in performing an otherwise illegal act based on a threat of harm from outside forces. See supra note 9.

7

traffickers demonstrate coercion. See United States v. McIntyre, 612 F. App'x 77, 79-80 (3d Cir. 2015) (describing that victim testimony that they had either been beaten or been present while others were beaten was sufficient to demonstrate coercion that was used to cause them to engage in commercial sex acts); United States v. Fields, No. 8:13-cr-198-T-30TGW, 2013 WL 5278499, at *1 (M.D. Fla. Sept. 18, 2013) (concluding that trafficker's threat of forcing opiate withdrawal sickness if victim did not prostitute herself was a harm serious enough to demonstrate coercion).

¶57 However, due to the circumstances of trafficking and the relationship between the trafficker and the victim, threats of bodily harm, sufficient to demonstrate coercion, do not always line up with the stereotypically immediate examples of coercion, such as committing a crime while being forced at gunpoint to do so. As the Legal Action of Wisconsin and LOTUS Legal Clinic confirmed in their brief to this court, "trafficking involves manipulating a victim's vulnerabilities, such as cultural isolation, financial dependency, or a need for love and belonging." Rather than stand-alone, explicit threats of violence, traffickers often form emotional bonds with their victims and, through ever-present abuse and control, manipulate them to commit acts they would not otherwise choose to do.

¶58 In similar circumstances, courts around the country have allowed victims of abuse to present expert testimony on battering and its effects in support of a duress[9] defense because

---

[9] The Court chose to use the term "duress," instead of coercion, because that was the term used more prevalently in the

it may help juries "understand the objective reasonableness of a defendant's actions in the situation [he or she] faced, which included the history of violent and psychological abuse." United States v. Dingwall, 6 F.4th 744, 754 (7th Cir. 2021).

¶59 The facts in Dingwall are very similar to the circumstances of abuse and manipulation that we often see in trafficking situations. Marjory Dingwall was a victim stuck in a relationship with her abusive boyfriend, Aaron Stanley. Id. at 748. After Stanley began to use drugs, a pattern of behavior emerged: "Stanley would beat Dingwall, then apologize profusely, and things would then return to 'normal' for a while until Stanley would fly into a rage again." Id. Stanley exhibited controlling behavior towards Dingwall, including stealing her EBT card, making it difficult to buy food. Id. "Dingwall wanted to leave, but she felt that she had no other options." Id.

¶60 The abuse became worse when Stanley began using crack cocaine. Id. To get money for drugs, Stanley began robbing stores. When he began to feel that he was "hot," he accused Dingwall of owing him money and pistol-whipped her when she was not able to come up with any. Id. Stanley then forced Dingwall

_____

Seventh Circuit under similar circumstances. See United States v. Dingwall, 6 F.4th 744, 746 n.1 (7th Cir. 2021) (explaining that the Seventh Circuit Pattern Criminal Jury Instructions "describe[d] 'coercion/duress' as when the defendant has proven that she committed the offense 'because [she was] coerced'; and '[t]o establish that [she] was coerced, [the] defendant must prove' fear of immediate death or serious injury if she did not commit the offense, and had no reasonable opportunity to refuse to commit the offense." Seventh Circuit Pattern Crim. Jury Instr. § 6.08 (2020 ed.)).

9

to rob a convenience store, which she did. Id. Stanley did not hit her that night and was "nice" to her, which sent the message that "committing the crime as ordered was a way to avoid his abuse." Id.

¶61 This process repeated itself two more times until Dingwall was arrested and charged with three counts of robbery. Id. at 749. However, she claimed that she committed the robberies under duress, in fear of violence at the hands of her boyfriend. Id. at 745-46. The district court denied Dingwall's claim and concluded that it was "not sufficient under existing circuit precedent, reasoning that even if Dingwall's evidence were credited, the duress requirements of imminence and of no legal alternatives could not be satisfied." Id. at 750.

¶62 On appeal, the Seventh Circuit joined numerous state courts, as well as the Sixth, Ninth, and District of Columbia Circuits in concluding that a victim of abuse may put forth a duress defense by producing expert testimony on battering and its effects. Id. at 754. In so doing, the Court rejected a "strict physical proximity test to establish a reasonable fear of imminent violence." Id. at 757. It reasoned that a jury could conclude that Stanley's pattern of abuse and manipulation demonstrated "an expectation of and level of control over Dingwall, even when physically separate" and that "Stanley's threats could have caused a reasonable person in Dingwall's situation to fear imminent violence." Id. at 758.

¶63 The Court also concluded that Stanley's continuous violence against Dingwall, contrasted with his being "nice" when

10

Dingwall did what he wanted, "showed a level of manipulation and a style of communication that could lead a reasonable person in her situation to have interpreted Stanley's demands and behavior as a threat of imminent violence unless she committed each robbery." Id. Likewise, the Court concluded that the repeated abuse and its psychological impact on Dingwall were factors that could be considered in determining whether she reasonably believed that she lacked an alternative to breaking the law.

¶64 Accordingly, the Seventh Circuit reversed the district court and concluded that the evidence of battery and its effects was potentially relevant and sufficient to support a duress defense to the robbery charges. Id. at 761. In doing so, it recognized that victims of abuse and manipulation—like that experienced by trafficking victims—are able to utilize the traditional coercion/duress defense for most criminal defenses.

2. Coercion[10] as a Defense to Murder under the Common Law

¶65 "Stemming from antiquity, the [constant tradition] of Anglo-American common law is that duress never excuses murder, that the person threatened with his own demise 'ought rather to die himself, than escape by the murder of an innocent.'" Joshua Dressler, Exegesis of the Law of Duress: Justifying the Excuse and Searching for Its Proper Limits, 62 S. Cal. L. Rev. 1331, 1370 (1989) (quoting 4 W. Blackstone, Commentaries on the Laws of England, at *30). In the seminal case, Regina v. Tyler, two men were on trial for the murder of a town constable. Regina v. Tyler, [1837] 8 C.P. 616, 923. The two men were followers of a revolutionary, a man named Thom. Id. Thom shot and stabbed the constable and, while the constable was still alive, ordered the

_____

[10] For purposes of the common law rule prohibiting the use of coercion as a complete defense to first-degree murder, courts historically have used the defenses of "coercion" and "duress" interchangeably. See, e.g., Moes v. State, 91 Wis. 2d 756, 766, 284 N.W.2d 66 (1979) (employing both terms and explaining that the obligation for the state to disprove an affirmative defense was not changed in 1955 when Wisconsin adopted the criminal code; Campbell v. State, 999 P.2d 649, 659 (Wyo. 2000) (citing Amin v. State, 811 P.2d 255, 260 (Wyo. 1991)) ("Coercion or duress has been recognized as a defense to criminal charges, other than a charge of taking the life of an innocent person. Coercion or duress must be present, imminent or impending, and of such a nature so as to induce a well-grounded fear of death or serious bodily harm if the otherwise criminal act is not done."); Frasher v. State, 260 A.2d 656, 661 (Md. Ct. Spec. App. 1970) (citing 1 Anderson Wharton's Criminal Law § 123, at 261) ("[I]t is a defense as to all crimes except taking the life of an innocent person that the defendant acted under a compelling force of coercion or duress."); 40 Am. Jur. 2d Homicide § 107 (2019) ("It is generally held that neither duress, coercion, nor compulsion are defenses to murder . . . ." (citations omitted)). Cf. People v. Heath, 255 Cal. Rptr. 120, 125 (Cal. Ct. App. 1989) (critiquing conflation of duress and necessity without comment on conflation between coercion and duress).

12

defendants to throw the constable into a ditch. Id. at 923-24. Thom was later killed by the military and the defendants were arrested for their role in the constable's murder. Id. at 924.

¶66 At trial, the defendants argued that they complied with the order only "from a fear of personal violence to themselves at the hands of Thom." Id. at 924. Lord Denman, sitting in judgment for the Crown, concluded that this excuse must be "discard[ed,]" id. at 926, and these circumstances had "never been received by the law as an excuse for his crime, and the law is, that no man, from a fear of consequences to himself, has a right to make himself a party to committing mischief on mankind." Id. at 925.

¶67 Similarly, the Alabama Supreme Court concluded that a man was not excused for murder, even when he was forced to do so at gunpoint. Arp v. State, 12 So. 301, 302-03 (Ala. 1893). In so concluding, the court traced the history of the common law's treatment of coercion as a defense to murder. See id. at 302-03. The Court recognized that the authorities were conclusive that "at common law no man could excuse himself, under the plea of necessity or compulsion, for taking the life of an innocent person." Id. at 303. In keeping with the common law history, the Court upheld the conviction and reasoned that "the immediate necessity or compulsion under which he acted at the time [was] no excuse to him." Id. at 304.

¶68 Likewise, in recent history, the California Supreme Court has reaffirmed the prudence behind the common law's tradition by concluding that, "as in Blackstone's England, so

13

today in California: fear for one's own life does not justify killing an innocent person." Anderson, 50 P.3d at 369. In Anderson, the defendant, Anderson, and his accomplice, a man named Kiern, were convicted of murdering a camp counselor who had allegedly molested one of their children. Id. at 370. According to Anderson, a large group of people, including himself and Kiern, had kidnapped the counselor, taken her out to a field, stripped her of her clothes, beat her, put duct tape over her mouth, and abandoned her. Id. Anderson and Kiern later saw the counselor going naked down the street. Id. The two grabbed her and forced her into the back of Kiern's car and drove away. Id.

¶69 Anderson testified that, after they had re-kidnapped the counselor and brought her back to the field, Kiern ordered him to get a nearby rock. Id. The defendant replied that Kiern was "out of [his] mind," to which Kiern responded, "Give me the rock or I'll beat the shit out of you." Id. Because of the physical disparities between himself and Kiern, the defendant testified to being scared that Kiern would "break [his] neck" if he did not comply. Id. Using the rock retrieved by Anderson, Kiern knocked the counselor unconscious and later the two killed her by dropping a small boulder on her head. Id.

¶70 At trial, Anderson, based primarily on his "testimony that Kiern threatened to 'beat the shit out of' him, [] contended on appeal that the trial court erred in refusing to instruct the jury on duress as a defense to the murder charge." Id. The California Supreme Court, in affirming the refusal to

14

instruct the jury on defense, explained that the common law reasoning for the defense of duress for crimes is that "for reasons of social policy, it is better that the defendant, faced with a choice of evils, choose to do the lesser evil (violate the criminal law) in order to avoid the greater evil threatened by the other person." Id. at 371 (quoting Wayne R. LaFave, Criminal Law, § 5.3(b), at 467 (3d ed. 2000)). However, this lesser of two evils rationale is "strained when a defendant is confronted with taking the life of an innocent third person in the face of a threat on his own life[.]" Id. (quoting United States v. LaFleur, 971 F.2d 200, 205 (9th Cir. 1991)). "When the defendant commits murder under duress, the resulting harm——i.e. the death of an innocent person——is at least as great as the threatened harm——i.e. the death of the defendant." Anderson, 50 P.3d at 371 (quoting LaFleur, 971 F.2d at 205).

¶71 The Court concluded that the reasoning behind the rule that fear for one's own life does not justify killing an innocent person applies "as well to 19th-century California as to Blackstone's England." Anderson, 50 P.3d at 374. Accordingly, it concluded that both the common law and California law prohibited duress from being a defense to murder. Id.

¶72 In Wisconsin, the common law defense of coercion is codified in Wis. Stat. § 939.46(1) which provides:

> A threat by a person other than the actor's coconspirator which causes the actor reasonably to believe that his or her act is the only means of preventing imminent death or great bodily harm to the actor or another and which causes him or her so to act

15

is a defense to a prosecution for any crime based on that act, except that if the prosecution is for first-degree intentional homicide, the degree of the crime is reduced to 2nd-degree intentional homicide.

Section 939.46(1) explicitly confirms the common law rule that coercion is not a complete defense to first-degree intentional homicide. In addition, the legislature has provided that a successful coercion defense may mitigate a first-degree intentional homicide to 2nd-degree. Wis. Stat. § 940.01(2)(d).

### 3. Wisconsin Stat. § 939.46(1m)

¶73 Wisconsin Stat. § 939.46(1m) follows the codification of the common law defense of coercion. It provides, "A victim of a violation of s. 940.302(2) or 948.051 has an affirmative defense for any offense committed as a direct result of the violation of s. 940.302(2) or 948.051 without regard to whether anyone was prosecuted or convicted for the violation of s. 940.302(2) or 948.051." § 939.46(1m). The majority/lead asserts that it is "unclear" whether subsec. (1m) constitutes a coercion defense[11] and determines that subsec. (1m) is ambiguous as to the question of whether it provides a complete defense to first-degree intentional homicide or merely mitigates it to a charge of second-degree.[12] The majority/lead opinion further concludes that there are no extrinsic sources, including legislative history that can be used to resolve the ambiguity.[13] Accordingly, the majority/lead resorts to the rule of lenity to

---

[11] Majority/lead op., ¶25.

[12] Id., ¶27.

[13] Id., ¶28.

16

conclude that subsec. (1m) provides the accused a complete defense to first-degree intentional homicide.[14] I disagree and conclude that extrinsic factors direct us towards the conclusion that subsec. (1m) mitigates a charge of first-degree intentional homicide to a second-degree charge consistent with Wis. Stat. § 939.46(1).

¶74 The first question that must be answered is whether Wis. Stat. § 939.46(1m) provides a coercion defense at all. The majority/lead opinion asserts that "common law coercion is irrelevant to our analysis."[15] As previously noted, subsec. (1m) is located under the section title, "Coercion." And while the majority/lead is correct that "titles . . . are not part of the statutes[,]"[16] they are "permissible indicators of meaning." State v. Lopez, 2019 WI 101, ¶41, 389 Wis. 2d 156, 936 N.W.2d 125 (Rebecca Grassl Bradley, J., concurring) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 221 (2012)). Statutory titles may be used to resolve a doubt and confirm a statute's meaning. Id., ¶¶26-29. Because we "presume that the legislature is aware of existing law when it passes a new statute[,]" we presume the placement of subsec. (1m) was not done accidentally or without prior thought. Prosser v. Leuck, 225 Wis. 2d 126, 150, 592 N.W.2d 178 (1999). "When the legislature adopts non-statutory language in titles, that language has meaning and reflects a decision of the

[14] Id., ¶29.

[15] Id., ¶28 n.11.

[16] Id., ¶25 (quoting Wis. Stat. § 990.001(6)).

17

legislature." Lopez, 389 Wis. 2d 156, ¶27. See also Scalia & Garner, supra, 327 (quoting James DeWitt Andrews, "Statutory Construction," in 14 American Law and Procedure 1, at 21-22 (James Parker Hall & James DeWitt Andrews eds., rev. ed. 1948) ("The title is adopted by the legislature.")).

¶75 The availability of Wis. Stat. § 939.46(1m) as a coercion defense is confirmed by the legislative history. Subsection (1m) was based, in part, on the model legislation compiled by the Polaris Project.[17] A provision of the model legislation, included and referenced throughout the drafting materials, directed that legislatures to include the following section:

<u>VICTIM IMMUNITY FROM PROSECUTION</u>

In any prosecution of a person who is a victim of trafficking in persons, it shall be an affirmative

---

[17] According to the document,

The Model Elements of Comprehensive State Legislation to Combat Trafficking in Persons (Comprehensive Model Law) is divided into three sections: 1) Prosecution, 2) Prevention of Trafficking, and 3) Victim Protection. Language in this model law draws from numerous sources, including: A) the Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386; B) Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today (PROTECT) Act of 2003, Pub. L. No. 108-21; C) the Department of State's Model Anti-trafficking law, released March 12, 2003, D) the Department of Justice's Model State Anti-trafficking Criminal Statute, released July 16, 2004; and E) current proposed and previously enacted State Statutes related to combating human trafficking in various U.S. States.

Drafting File, 2007 Act 116, Legislative Reference Bureau, Madison, Wis.

> defense that he or she was under duress [if defined under state law] and/or coerced [if defined under state law] into committing the offenses for which he or she is being subject to prosecution.

This characterization of subsec. (1m) as a defense of coercion in the model legislation, coupled with the legislature's decision to place it within § 939.46 (titled "Coercion") is persuasive evidence that subsec. (1m) provides a coercion defense.

¶76 Because coercion does not provide a complete defense to first-degree intentional homicide at common law and because Wis. Stat. § 939.46(1m) is a coercion defense, the next question I must answer is whether subsec. (1m)'s language "clearly expresse[s]" and "leaves no doubt" of the legislature's purpose to abrogate the common law principle that coercion is not a complete defense to first-degree intentional homicide. Fuchsgruber, 244 Wis. 2d 758, ¶25. I conclude that § 939.46(1m) does not abrogate the common law.

¶77 Initially, I note that the majority/lead opinion implicitly agrees that the language of Wis. Stat. § 939.46(1m) does not expressly abrogate the common law by providing a complete defense to first-degree intentional homicide. The majority/lead admits that it is "unclear" whether subsec. (1m) "would mitigate a first-degree intentional homicide charge to a second-degree one."[18] This is hardly indicative that the language is a "clear, unambiguous and peremptory" abrogation. Maxey, 94 Wis. 2d at 399.

---

[18] Majority/lead op., ¶25.

19

¶78 <u>Nelson v. Hansen</u>, provides a helpful example of the type of language needed to abrogate the common law. <u>Nelson v. Hansen</u>, 10 Wis. 2d 107, 102 N.W.2d 251 (1960). The common law rule addressed in <u>Nelson</u> was that an "owner was not liable for damages resulting from the vicious act of his dog unless he had prior knowledge of its vicious propensities . . . or the injury was attributable to some negligence [in the manner in which the owner kept his domestic animals]." <u>Id.</u> at 113. Furthermore, a domestic animal owner who neither (1) owned an animal that was known to be abnormally dangerous and (2) had reason to know was abnormally dangerous but which was likely to do harm unless controlled, "[was] liable for the harm done by such an animal only if he fail[ed] to exercise reasonable care to confine or otherwise control it, or the harm is of a sort which it is normal for animals of that class to do." <u>Id.</u> at 113-14.

¶79 In <u>Nelson</u>, we examined what effect Wis. Stat. ch. 174 (1955-56) had on this common law rule. <u>See</u> <u>id.</u> at 115. Wisconsin Stat. § 174.02 provided that:

> Owner's liability. The owner or keeper of any dog which shall have injured or caused the injury of any person or property or killed, wounded or worried any horses, cattle, sheep or lambs shall be liable to the person so injured and the owner of such animals for all damages so done, without proving notice to the owner or keeper of such dog or knowledge by him that his dog was mischievous or disposed to kill, wound, or worry horses, cattle, sheep, or lambs.

<u>Id.</u> at 113 n.1 (quoting § 174.02). We concluded that the statute's language expressly provided that it was "dispens[ing] with the necessity of proving scienter in cases when the injury is done by a dog because of a mischievous trait or propensity."

20

Id. at 119. Accordingly, because of the unambiguous overlap and clear applicability of the statute to an aspect of the common law rule on dog owner liability, we recognized that the section abrogated a portion of the common law. Id. We also concluded that because the elimination of scienter was in derogation of the common law, § 174.02 must be strictly construed. Id. at 119.

¶80 Turning to Wis. Stat. § 939.46(1m), the clear expression of the legislature's desire to abrogate the common law is not present. As the majority/lead concedes, common law coercion was not a defense to homicide. The common law rule is clear: coercion is not and has never been a complete defense to first-degree intentional homicide.

¶81 The majority/lead opinion, by concluding that Wis. Stat. § 939.46(1m) provides a complete defense, ignores that subsec. (1m)'s text does not clearly express a complete defense to first-degree intentional homicide. Therefore, the majority/lead opinion is forced to rely on an absence of statutory text to make its conclusions.[19] Accordingly, because the majority/lead's interpretation of subsec. (1m) provides a complete defense to first-degree intentional homicide, it abrogates the common law without the required level of legislative clarity and purpose; therefore, its interpretation of § 939.46(1m) is erroneous.

D. Statutory Interpretation

---

[19] Id., ¶26.

¶82 Finally, the last remaining question that I must answer is, "How should Wis. Stat. § 939.46(1m) be interpreted if it cannot provide a complete defense?" The State's argument, consisting of statutory cross-references, is grounded in the text and context of § 939.46(1m) and supports the common law rule that coercion is not a complete defense to first-degree intentional homicide. Accordingly, I conclude that § 939.46(1m) has the potential to reduce the crime of first-degree intentional homicide to a charge of second-degree intentional homicide, as the statutory links I examine below show.

¶83 Wisconsin Stat. § 940.01(1) is our first statute to consider. It sets out the elements of first-degree intentional homicide. Section 940.01(1) is linked to "Mitigating circumstances" in § 940.01(2).

¶84 Wisconsin Stat. § 940.01(2), our second link, provides, "The following are affirmative defenses to prosecution under this section which mitigate the offense to 2nd-degree intentional homicide under s. 940.05." Subsection 940.01(2) has various paragraphs, one of which is relevant to our discussion.

¶85 Wisconsin Stat. § 940.01(2)(d), our third link, provides that first-degree intentional homicide is mitigated to second-degree homicide when, "Death was caused in the exercise of a privilege under s. 939.45(1)." The question at this point in my examination of the context in which Wis. Stat. § 939.46(1m) was placed is whether the trafficker's death was cause by Kizer's exercising a "privilege under s. 939.45(1)."

22

¶86 Accordingly, I move to the fourth link, Wis. Stat. § 939.45, which provides, "The fact that the actor's conduct is privileged, although otherwise criminal, is a defense to prosecution for any crime based on that conduct. The defense of privilege can be claimed under any of the following circumstances[.]"

¶87 Wisconsin Stat. § 939.45(1) is the fifth link. It provides, "(1) When the actor's conduct occurs under circumstances of coercion or necessity so as to be privileged under s. 939.46 or 939.47," the defendant can raise the defense of privilege "under [Wis. Stat.] § 939.46." Here, Kizer claims a defense of privilege by raising § 939.46(1m), which as I explained above, and summarize below, involves coercion.

¶88 Wisconsin Stat. § 939.46 is titled, "Coercion." The majority/lead implies and I conclude that Kizer, as a commercially sex trafficked victim, was subjected to on-going coercion by her trafficker, whom she killed. Therefore, she has alleged the required status of a coerced defendant to raise privilege under § 939.46 as a defense to prosecution for his homicide according to the directive of Wis. Stat. § 939.45(1).

¶89 The sixth link in the legislature's statutory chain places us on Wis. Stat. § 939.46(1m). Section 939.46(1m) falls within Wis. Stat. § 939.45(1)'s general designation of § 939.46 as a collective provision that does not limit § 939.46's use by subsection designation. Therefore, § 939.45(1) includes the subsection at issue here, § 939.46(1m), to which coercion is a defense.

23

¶90 As I have explained in some detail earlier, at common law, coercion is not a complete defense to first-degree intentional homicide. That continued when common law coercion was codified in Wis. Stat. § 939.46(1). In addition, § 939.46(1) provided the potential to mitigate first-degree intentional homicide to 2nd-degree intentional homicide. Because the legislature did not clearly express an intent to abrogate the common law when it codified coercion in § 939.46(1), but simply provided the potential to mitigate first-degree intentional homicide to 2nd-degree intentional homicide, employing § 939.46 as a collective provision at the directive of § 939.45(1) encompasses both §§ 939.46(1) and 939.46(1m).

¶91 "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." Kalal, 271 Wis. 2d 633, ¶44. In addition to the plain words of the text, "[c]ontext is important to meaning." Id., ¶46. Rather than in isolation, "statutory language is interpreted in the context in which it is used; . . . in relation to the language of surrounding or closely-related statutes . . . ." Id. "Statutes are closely related when they are in the same chapter, reference one another, or use similar terms." Reyes Fuerte, 378 Wis. 2d 504, ¶27 (citing CC Midwest, Inc., 302 Wis. 2d 599, ¶24). "[A] plain-meaning interpretation cannot contravene a textually or contextually manifest statutory purpose." Kalal, 271 Wis. 2d 633, ¶49. Similarly, in "construing or interpreting a statute

24

the court is not at liberty to disregard the plain, clear words of the statute." Id., ¶46.

¶92 Apart from its derogation of the common law, the majority/lead's interpretation of Wis. Stat. § 939.46(1m) also fails because it seeks to contravene a textually and contextually manifest interpretation. The majority/lead concludes that, based on the statute's context and comparisons to the language in other statutes, "a defense is complete as to first-degree intentional homicide unless the statute contains express language regarding mitigation."[20] While comparisons to surrounding statutes are a permissible source of statutory context, they are not the only source. "Statutes are closely related when they . . . reference one another[.]" Section 939.46(1m) is linked, through the cross-reference chain I describe above, to Wis. Stat. § 940.01 which lists affirmative defenses that mitigate a charge of first-degree intentional homicide to second-degree intentional homicide.

¶93 Furthermore, the majority/lead's interpretation elevates the negative implication of Wis. Stat. § 939.46(1m)'s text (the absence of explicit mitigation language) over its plain, objective meaning, as understood by the statutory cross-references described above. It is the text of the statute that controls——not the absence of text.[21] By failing to read the

---

[20] Id. (citing Kalal, 271 Wis. 2d 633, ¶46).

[21] See Corley v. United States, 556 U.S. 303, 327 (2009) (Alito, J., dissenting) (stating that there is no authority for "a canon of interpretation that favors a 'negative implication'. . . over clear and express statutory language.").

25

statute reasonably, see Scalia & Garner, supra, 355, the majority/lead misses the forest for the trees and contravenes the textually and contextually manifest purpose of the statutory scheme enacted by the legislature. Because both the text and context of § 939.46(1m) instruct me to do so, I conclude that § 939.46(1m) has the potential to mitigate a charge of first-degree intentional homicide to a charge of second-degree intentional homicide, rather than providing the perpetrator complete exoneration for the crime.

### III. CONCLUSION

¶94 In accord with the common law principle that coercion is not a complete defense to first-degree intentional homicide as well as the text and surrounding context of Wis. Stat. § 939.46(1m), I conclude that § 939.46(1m)'s trafficking defense, which is grounded in coercion, is not a complete defense to first-degree intentional homicide. Rather, it comes within § 939.46(1) and has the potential to mitigate the charge of first-degree intentional homicide to second-degree intentional homicide. The majority/lead opinion errs because its interpretation of § 939.46(1m) abrogates the common law by making coercion a complete defense to first-degree intentional homicide and ignoring the context in which the legislature placed § 939.46(1m). Accordingly, I respectfully dissent.

¶95 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice BRIAN HAGEDORN join this dissent.

26